**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| KNOSSOS GLOBAL SYSTEMS LLC,<br><br>   Plaintiff,<br><br>   v.<br><br>ZOHO CORPORATION PRIVATE LIMITED,<br><br>   Defendant. | Civil Action No. 2:25-cv-00414-JRG-RSP<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFF KNOSSOS GLOBAL SYSTEMS LLC'S OPENING CLAIM
CONSTRUCTION BRIEF**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... iii

I.      INTRODUCTION.................................................................................................................. 1

II.     LEGAL STANDARD ............................................................................................................ 1

III.    BACKGROUND OF THE PATENTS.................................................................................. 3

IV.     ARGUMENT.......................................................................................................................... 4

        A.   "PRIVATE DOMAIN" (ALL ASSERTED CLAIMS) ............................................................. 4

             1.   No Construction Is Necessary..................................................................................... 4

             2.   Zoho's Proposed Construction Is Incorrect ........................................................... 5

                  a.   The intrinsic record refutes Zoho's construction. .......................................... 6

                  b.   Dr. Weissman's arguments do not withstand scrutiny. ............................... 10

        B.   "PRIVATE ROUTING ADDRESS" (CLAIMS 5 AND 6 OF THE '410 PATENT).................. 13

        C.   "THE RECIPIENT ADDRESS" (CLAIMS 9, 10 OF '410 PATENT; CLAIMS 11–
             13 OF '421 PATENT)............................................................................................... 15

        D.   CLAIMS 24, 26, 70, 72 OF THE '421 PATENT ............................................................... 17

V.      CONCLUSION .................................................................................................................... 18

# TABLE OF AUTHORITIES

**Cases**

*CryptoPeak Sols., LLC v. Lowe's Home Ctrs.*, No. 2:15-cv-1737-RWS-RSP, 2016 U.S. Dist. LEXIS 135666 (E.D. Tex. Sep. 9, 2016) ........................................................................ 16

*Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366 (Fed. Cir. 2006) .... 15, 16, 17, 18

*GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304 (Fed. Cir. 2014) ................................... 2

*Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362 (Fed. Cir. 2014) ..................................... 2

*HTC Corp. v. IPCom GmbH & Co., KG*, 667 F.3d 1270 (Fed. Cir. 2012) .................................. 19

*IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377 (Fed. Cir. 2005) ....................... 18, 19

*Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898 (Fed. Cir. 2004) ................................. 2, 6, 8

*Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367 (Fed. Cir. 2008) ....................................................................................................................................... 19

*Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91 (2011) ................................................................. 3

*Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898 (2014) ............................. 3, 14, 15, 16, 17

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ............................ 1, 2, 5, 11, 16

*Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370 (Fed. Cir. 2017) .................................. 15, 17

*Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362 (Fed. Cir. 2012) .............................. 2

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) ..................................... 1, 2

**Statutes**

35 U.S.C. §282 ............................................................................................................................... 3

## I.    INTRODUCTION

Pursuant to the Court's Docket Control Order and Local Patent Rule 4-5(a), Plaintiff Knossos Global Systems LLC ("Knossos") submits its Opening Claim Construction Brief in support of its proposed constructions for the disputed terms of U.S. Patent No. 8,819,410 (the "'410 patent" ; *see* **Exhibit A**) and U.S. Patent No. 8,266,421 (the "'421 patent"; *see* **Exhibit B**) (collectively, the "Asserted Patents").

The purpose of claim construction is resolution of genuine disputes concerning a claim term's meaning and to simplify technical terms for the jury.  Defendant Zoho Corporation Private Limited ("Zoho") has taken a different approach, advancing unsupported indefiniteness positions across multiple claims while proposing a limiting construction for "private domain" that misreads the specification by attributing to the domain a characteristic—routability—that the intrinsic record attributes only to addresses.  Zoho's expert, Dr. Jon Weissman, offers several arguments in support of Zoho's proposed construction, but none withstands scrutiny when examined against the intrinsic record.  Indeed, Zoho has provided no facts that could compel this Court to depart from the bedrock principle that the "words of a claim 'are generally given their ordinary and customary meaning.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

Moreover, Zoho's indefiniteness challenges to three of the four terms falls well short of the clear and convincing evidence standard it must meet.  While Zoho offers the expert testimony of Dr. Weissman for "private domain" it offers no POSITA testimony in support of its indefiniteness positions.  Thus, as explained in detail below, the Court should reject each of Defendant's proposals.

## II.    LEGAL STANDARD

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to

which the patentee is entitled the right to exclude.'" *Phillips*, 415 F.3d at 1312. "[T]he words of a claim are generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1312–13. The intrinsic evidence—the claims, the specification, and the prosecution history—provides the primary basis for claim construction. *Id.* at 1314–17. "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* at 1315 (quoting *Vitronics*, 90 F.3d at 1582).

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution." *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)). The standards for finding lexicography or disavowal are "exacting." *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014). "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Id.* (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004)).

A patent claim is indefinite only if it, "read in light of the specification delineating the patent, and the prosecution history, fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). The party challenging validity bears the burden of proving indefiniteness by clear and

convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011) (citing 35 U.S.C. §282).

### III. BACKGROUND OF THE PATENTS

Knossos filed this action alleging infringement of U.S. Patent Nos. 8,819,410 (the "'410 patent") and 8,266,421 (the "'421 patent") (collectively, the "Asserted Patents") by Zoho Corporation Private Limited's Zoho Mail product. *See* Dkt. No. 1 (the "Complaint"). The Asserted Patents share a common specification and are directed to methods and systems for private electronic information exchange.

The Asserted Patents solve a problem that existed in conventional electronic mail systems: encryption protected message content, but left routing and address information publicly exposed. '410 patent at 1:33–35 (conventional systems "the equivalent of postcards readable by anyone watching them go by"); *id.* at 1:40–62 (encryption "succeed[s] in making message content unreadable except by the recipient" but "[n]one of these solutions make anything other than the content private"). As a result, email addresses remained vulnerable to spoofing, spam, and phishing attacks even when content was encrypted. *Id.* at 1:47–62.

The Asserted Patents address this problem through a private-domain transmission architecture that makes both content and addresses private. The specification describes "a private network community" served by dedicated servers, where membership is controlled and private addresses are used. '410 patent at 4:30–34; *id.* at 3:8–14 ("private domain" implemented "within a server associated with the private domain"). The claims implement this architecture through several mechanisms: (1) a membership-based private domain with server-mediated membership determination, id. at claim 1 ("determining... whether the recipient is a member of the private domain by examining a record of members"); (2) private routing addresses, including addresses using a Private Top Level Domain ("PTLD"), *id.* at 5:10–21; 10:8–15; see also id. at claim 67

("the private routing address includes a Private Top Level Domain (PTLD)"); (3) encryption of content using transmission-specific symmetric keys, *id.* at 5:56–6:10; and (4) security packages containing the encrypted symmetric key, encrypted with the recipient's public key, *id.* at 6:11–32. *See, e.g.*, '410 patent, claims 1, 5–7, 8–11, 19–20; '421 patent, claims 1, 7–8, 11–13, 20, 24, 27.

The specification of the '410 patent describes the technical problems that existed in private electronic communications in 2004. In the early 2000s, the Internet had become a "new form of commons" allowing for widespread global communication, and the protocol for sending email—SMTP (simple mail transport protocol)—was simple and easy to implement. '410 patent at 1:19–29. However, conventional electronic mail systems, including those employing encryption, were "the equivalent of postcards readable by anyone watching them go by." *Id.* at 1:33–34. Encryption addressed message content, but left "everything other than the content" publicly exposed—email addresses remained "publicly routable and mutable on the open Internet leading to exposure to spam, viruses, and fraud." *Id.* at 1:40–62.

## IV. ARGUMENT

### A. "PRIVATE DOMAIN" (ALL ASSERTED CLAIMS)

| Knossos's Position | Zoho's Proposed Construction |
|---|---|
| No construction necessary. | "a domain that is not routable via a public network" |

#### 1. No Construction Is Necessary

The term "private domain" is unambiguous, easily understood on its face, and does not require construction. The claims themselves define the contours of "private domain" with clarity. Claim 1 of the '410 patent recites: registering a sender to "access services of a private domain"; using "the private domain for electronic information transmissions between members of the private domain"; and operations performed at "a server associated with the private domain." '410 patent,

---

claim 1. The '421 patent similarly defines "private domain" in membership and subscription terms: "accepting a subscription to services of a private domain by a sender in order to allow the sender to use the private domain for electronic information transmissions." '421 patent, claim 1; *see also id.* at claims 8, 24, 25 (same). The term is thus defined in context as a domain with members, associated servers, and encrypted transmissions. *See Phillips*, 415 F.3d at 1314 ("the context in which a term is used in the asserted claim can be highly instructive"). The specification confirms this understanding: "private domain (e.g., private network) addresses are used to define users in a private domain, also referred to as a private network community." '410 patent at 4:30–34. The "private domain" is fundamentally a membership-based community served by dedicated infrastructure—not merely a routing characteristic.

### 2. Zoho's Proposed Construction Is Incorrect

Even if construction were necessary, Zoho's proposed construction—"a domain that is not routable via a public network"—is incorrect. It misreads the specification by attributing to the "private domain" a characteristic that the intrinsic record attributes only to certain *addresses*, not domains. This construction focuses exclusively on routing behavior while disregarding the membership, server association, and encryption characteristics that the claims and specification treat as fundamental to the "private domain." The Federal Circuit has "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Liebel-Flarsheim*, 358 F.3d at 906. Zoho's construction commits a similar error—importing language describing addresses into a different term, i.e., domain, that describes a membership community.

Zoho's construction commits a category error. The mechanisms that create non-routability—the two-portion address structure and the Private Top Level Domain ("PTLD")—appear in dependent claims, not independent claim 1. Claim 6, which depends from claim 5 (which

in turn depends on claim 1), recites a two-portion address structure where "the private routable address as a whole is not routable within the public domain of the network." '410 patent, claim 6. Claim 7 separately introduces the PTLD. *Id.*, claim 7. This claim architecture demonstrates that non-routability is an additive feature residing at the *address* layer, not a defining characteristic of the "private domain" term in claim 1. Importing the express non-routability limitation of claim 6 into the bare term "private domain" would read claims 5, 6, and 7 out of the patent.

The specification's statement that "[e]lectronic information in this private domain will not route outside of the private domain," '410 patent at 3:10–23, does not require a different result. That sentence describes the *architectural effect* of the claimed membership, server, and encryption system—it is consistent with the "private network community" definition at column 4, *id.* at 4:30–34, and does not displace the membership characteristics that claim 1 actually recites. The passage explains what happens within the system the patentee built, not what a "private domain" must mean as a matter of claim scope. Reading the sentence as an independent definition would contradict the claim-differentiation analysis and render the express non-routability language of dependent claims 6 and 7 superfluous.

### a.    *The intrinsic record refutes Zoho's construction.*

The specification does not define "private domain" as "not routable via a public network." The passage Zoho relies upon—"[e]lectronic information in this private domain will not route outside of the private domain," '410 patent at 3:10–23—describes the effect of the private-domain architecture, not a limitation on the term's scope. The very next sentences describe what "may" happen "[i]n one embodiment" and "[i]n another embodiment," demonstrating that the patentee was distinguishing definitional statements from embodiment-specific disclosures. More fundamentally, the specification's discussion of non-routability focuses on addresses— specifically, addresses using a Private Top Level Domain ("PTLD") that "is not routable over the

---

open Internet." '410 patent at 10:8–15.  That certain private addresses may use structures that are not publicly resolvable—such as the private addresses described in Claims 6 and 7—does not mean the "private domain" is defined by that characteristic.  Those are optional address features introduced by dependent claims, not defining features of the domain itself.  The private domain encompasses the entire infrastructure—servers, membership databases, encryption systems, and addressing conventions—within which private addresses operate.

The claim language confirms this understanding.  Claim 1 of the '410 patent recites "determining, at the server associated with the private domain, whether the recipient is a member of the private domain by examining a record of members of the private domain."  '410 patent, claim 1.  This limitation would be meaningless if "private domain" simply meant "not routable via a public network."  Instead, the claim treats the private domain as a membership-based community—one determines whether the recipient is a *member*, not whether their address is *routable*.

Claim differentiation confirms that non-public-routability is not inherent in "private domain."  Claim 6—a dependent claim—recites the specific address structure that renders a private routing address non-publicly-routable: "the private routing address includes a first portion and a second portion, wherein the first portion comprises a sequence of characters that are compatible with a public domain and are publicly routable over the public domain of the network, and the second portion comprises a different sequence of characters that are not compatible with the public domain of the network but are routable within the private domain of the network, wherein the private routable address as a whole is not routable within the public domain of the network."  '410 patent, claim 6.  Under basic claim differentiation principles, this limitation cannot already be inherent in the independent claims.  If "private domain" in Claim 1 already meant "not routable

via a public network," Claim 6's specific non-routable address structure would be entirely superfluous. The dependent claim proves that non-public-routability is an optional, additive feature—not a defining characteristic of the private domain itself. *See Liebel-Flarsheim*, 358 F.3d at 910 ("[W]here the limitation that is sought to be 'read into' an independent claim already appears in a dependent claim, the doctrine of claim differentiation is at its strongest."). Claim 7 further reinforces this point by adding that "the private routing address includes a Private Top Level Domain (PTLD)." '410 patent, claim 7. These dependent claims introduce the specific address structures that create non-routability—structures that would be redundant if the independent claims already required it.

The '421 patent claims are to the same effect. Claim 1 recites "accepting a subscription to services of a private domain by a sender in order to allow the sender to use the private domain for electronic information transmissions." '421 patent, claim 1. Claim 73 requires "receiving information from the recipient for becoming a member of the private domain prior to receiving the electronic information." *Id.*, claim 73. These limitations define the private domain by *membership*—not routing.

The specification also describes a system that interoperates with the public Internet rather than existing in isolation from it. Specifically, when a sender attempts to deliver a message to a recipient who is not yet a member, the server "sends a notification message to the email address of the recipient (e.g., a standard email addressed to the standard email address of the recipient) to notify the recipient that an email message is waiting in the private domain to be downloaded." '410 patent at 7:53–61. This notification uses ordinary public-Internet email routing. Similarly, the specification contemplates that "[s]erver farms may have tables that allow two-way communication with other private communities (e.g., peer-to-peer communities) if both

communities concur." '410 patent at 15:8–18. These disclosures demonstrate that "private domain" describes a membership-based community, not a network hermetically sealed from all external routing.

Finally, Zoho's construction would exclude the very embodiments the specification describes. If "private domain" means "a domain that is not routable via a public network," it cannot be reconciled with the claim 1 limitation "transmitting the electronic information, with the security package, over an electronic network to the recipient," where the specification describes that "electronic network" as including "the Internet." '410 patent at 5:38–57. As the specification confirms, the private domain operates over public infrastructure rather than in isolation from it— the private routing address may be "made public and still remain unroutable outside the private domain," and non-member notifications travel "to the standard email address of the recipient" using ordinary Internet routing. '410 patent at 3:10–23; 7:53–61. The private character of the domain thus resides in its membership architecture, not in isolation of its servers from all public routing.

The prosecution history confirms that membership—not routability—is the defining characteristic of the "private domain." During prosecution of the '410 patent application (No. 13/607,417), the examiner rejected the claims as anticipated by U.S. Patent No. 6,266,420 to Langford, mapping Langford's "secured group" communications onto the "private domain" limitation without reference to any routability characteristic. **Exhibit C**, June 24, 2013 Final Office Action, at KNOS-ZOHO001024–1025. To overcome Langford, the applicant amended claim 1 to add membership-based limitations: "electronic information transmissions between members of the private domain" and "determining, at the server associated with the private domain, whether the recipient is a member of the private domain by examining a record of

---

members of the private domain." **Exhibit D**, October 14, 2013 Amendment and Response, at KNOS-ZOHO001054–1055. The applicant argued that "Langford is completely silent as to communicating over a private domain, determining that a recipient is a member of a private domain, and providing the recipient's public key to the sender after it is determined that the recipient is also a member of the private domain." *Id.* at KNOS-ZOHO001065. In a telephone interview, "the Examiner indicated that the proposed amendments directed towards communication between members of a private domain would overcome the Langford reference." *Id.* at KNOS-ZOHO001062. The examiner's Interview Summary confirmed: "The examiner agreed that the proposed amendments overcome the last rejection." **Exhibit E**, October 16, 2013 Examiner Interview Summary, at KNOS-ZOHO001077 (documenting the October 8, 2013 telephonic interview). If "private domain" already meant "a domain that is not routable via a public network," these membership amendments would have been unnecessary—the applicant could simply have argued Langford's system was publicly routable. Instead, the applicant distinguished the prior art entirely on membership grounds. *See Phillips*, 415 F.3d at 1317.

### b.   *Dr. Weissman's arguments do not withstand scrutiny.*

Zoho's expert, Dr. Jon Weissman, offers several arguments in support of Zoho's proposed construction. None withstands scrutiny when examined against the intrinsic record.

*Dr. Weissman's specification arguments.* Dr. Weissman relies heavily on the specification's statement that "[e]lectronic information in this private domain will not route outside of the private domain." Weissman Decl. ¶ 52 (quoting '410 patent at 3:10–23). He contends this is an unconditional definitional statement because it is "not qualified by 'in one embodiment.'" *Id.* ¶ 53. But the very next sentences—which Dr. Weissman quotes—describe what "may" happen "[i]n one embodiment" and "[i]n another embodiment." *Id.* ¶ 52. Dr. Weissman also conflates the *private routing address* with the *private domain.* He acknowledges that the private routing address

"may have" formats of current Internet addresses but can be "made public and still remain unroutable outside the private domain." *Id.* That certain private *addresses* may use non-publicly-resolvable structures does not mean all private *domains are* defined by that characteristic, as the claim differentiation analysis above confirms.

*Dr. Weissman's extrinsic evidence.* Dr. Weissman cites RFC 1918 (addressing private IP addresses), a 2004 Wikipedia entry on DNS, and the Microsoft Computer Dictionary. Weissman Decl. ¶¶ 64–69. But extrinsic evidence "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Phillips*, 415 F.3d at 1319. Moreover, even Dr. Weissman acknowledges that "RFC 1918 addresses IP addresses rather than domain names." Weissman Decl. ¶ 67. RFC 1918 is titled "Address Allocation for Private Internets" and, by its own terms, "describes address allocation for private internets" and designates "blocks of the IP address space for private internets." RFC 1918 §§ 1, 3 (Weissman Decl. Ex. F). The Asserted Patents concern email addresses and domain names—not IP addresses. The Wikipedia entry Dr. Weissman cites actually supports Knossos: he quotes it as stating that "[a]ny IP computer network can use DNS to implement its own private name system." Weissman Decl. ¶ 48. This describes what a private naming system *is*—not that "private" necessarily means "completely non-routable."

*Dr. Weissman's "carrier packet" argument.* Anticipating the objection that the specification describes encrypted traffic traversing the public Internet, Dr. Weissman argues that the *carrier packet*—the TCP/IP packet—is addressed to a publicly routable server address, while the private address is encrypted inside the payload. Weissman Decl. ¶¶ 61–62. But this argument undermines his own construction. If the private address is "doubly insulated" because it is (1) not used to address the carrier packet and (2) encrypted within the payload, then the "private domain"

---

exists *regardless* of whether the carrier packet crosses public infrastructure. *Id.* ¶ 62. The private domain is the logical space in which private addresses operate—not a physical network that must be isolated from all public routing.

*Dr. Weissman's hybrid-routing concessions.* The specification describes a system that interoperates with the public Internet. Dr. Weissman acknowledges this, conceding that when a notification is sent to a non-member, it "uses an ordinary, publicly routable email address (the recipient's standard email address) and travels across the public Internet using ordinary Internet routing and DNS." Weissman Decl. ¶ 59. He also acknowledges inter-community communication, explaining that "messages whose private addresses are translated by the participating server farms" cross between private communities. *Id.* ¶ 60. Dr. Weissman's own explanations prove the point: the private domain continues to exist even when traffic crosses public infrastructure via server-mediated translation.

*Dr. Weissman's disclaimer.* Dr. Weissman attempts to preempt the objection that Zoho imports limitations from preferred embodiments by stating that his construction does not require "a particular implementation described in the specification, for example, the use of a non-standard private top-level domain, the use of encryption of addresses or message contents, hosting by a particular kind of server farm, or membership in a particular subscriber community." Weissman Decl. ¶ 71. But this disclaimer proves too much. Dr. Weissman disclaims that "private domain" requires *membership*—yet Claim 1 expressly recites "determining, at the server associated with the private domain, whether the recipient is a member of the private domain by examining a record of members of the private domain." '410 patent, claim 1. The specification defines "private domain" as "a private network community," '410 patent at 4:30–34—a definition that centers on *membership*, not routing. Zoho's construction inverts this emphasis. In sum, Zoho's proposed

---

construction misreads the specification by attributing to the "private domain" a characteristic, i.e., routability, that the intrinsic record attributes only to addresses. The claim language, specification, and prosecution history all confirm that "private domain" describes a membership-based community, not a routing characteristic. Claim differentiation further confirms that non-public-routability is an optional, additive feature introduced by dependent Claims 6 and 7, not a defining characteristic of the private domain itself. Dr. Weissman's arguments to the contrary do not withstand scrutiny. No construction is necessary.

### B.   "PRIVATE ROUTING ADDRESS" (CLAIMS 5 AND 6 OF THE '410 PATENT)

| Knossos's Position | Zoho's Proposed Construction |
|---|---|
| No construction necessary. Not indefinite. | Indefinite. |

The term "private routing address" is unambiguous, easily understood on its face, and does not require construction. Zoho's indefiniteness challenge is remarkable given that Claim 6—one of the very claims Zoho challenges—describes with precision one structure a private routing address may take:

> the private routing address includes a first portion and a second portion, wherein the first portion comprises a sequence of characters that are compatible with a public domain and are publicly routable over the public domain of the network, and the second portion comprises a different sequence of characters that are not compatible with the public domain of the network but are routable within the private domain of the network, wherein the private routable address as a whole is not routable within the public domain of the network.

'410 patent, claim 6.

As a dependent claim, Claim 6 adds this particular address structure as an optional feature—it does not define the full scope of "private routing address." But the very existence of this detailed structural limitation demonstrates that a POSITA would understand the term with reasonable certainty. Indefiniteness cannot exist where the intrinsic record provides such explicit

guidance. *See Nautilus*, 572 U.S. at 901 (claims are indefinite only if they "fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention").

The specification provides ample additional context confirming a POSITA's understanding of "private routing address." The specification teaches that, in one embodiment, "the address includes a first portion and a second portion" where "the address as a whole cannot be routed through the Internet." '410 patent at 6:57–64. It further discloses the PTLD example, explaining that a private routing address using a PTLD is "not routable over the open Internet, as industry standard TLDs are registered and controlled by an industry governing body, and the PTLD is not a part of the registered set." *Id.* at 9:62–10:32. These disclosures confirm a POSITA's understanding of "private routing address." As *Phillips* explains "the specification 'is always highly relevant to the claim construction analysis," and "it is the single best guide to the meaning of a disputed term." *Id.* at 1315 (quoting *Vitronics*, 90 F.3d at 1582).

To the extent Zoho's argument rests on antecedent basis—that claim 1 does not expressly recite "a private routing address" before claim 5 references it—this formalistic argument fails for multiple reasons. First, the law does not require express antecedent basis; antecedent basis may be supplied by implication where the scope is reasonably ascertainable. *See Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1370–1371 (Fed. Cir. 2006). Here, claim 19—which, like claim 5, depends from claim 1—expressly recites "transmitting the electronic information with a private routing address that is routable within the private domain…." '410 patent, claim 19. Second, the Abstract states the electronic information "is transmitted over an electronic network with a private routing address." Third, the concept of a "private routing address" is inherent in claim 1's recitation of transmission within a "private domain"—a POSITA would understand that routing within a private domain requires an address. Zoho cannot meet its burden

---

of proving indefiniteness by clear and convincing evidence. *Nautilus*, 572 U.S. at 901; *see also Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017). Given the explicit structural definition in claim 6, the detailed specification disclosures, and the multiple intrinsic references to "private routing address," Zoho cannot satisfy this heavy burden.

C.  **"THE RECIPIENT ADDRESS" (CLAIMS 9, 10 OF '410 PATENT; CLAIMS 11–13 OF '421 PATENT)**

| Knossos's Position | Zoho's Proposed Construction |
|---|---|
| **No construction necessary. Not indefinite.** | **Indefinite.** |

The phrase "the recipient address" is also unambiguous, easily understood on its face, and does not require construction. Zoho's indefiniteness argument is without merit for multiple independent reasons. First, the concept of a "recipient address" is inherent in claim 1's recitation of "transmitting the electronic information, with the security package, over an electronic network to the recipient." '410 patent, claim 1. A POSITA would understand with reasonable certainty that transmitting electronic information over a network to a specific recipient necessarily requires a recipient address—one cannot route electronic information to a recipient on a network without addressing. This is a fundamental concept in networked communications that any POSITA would immediately understand. *See Nautilus*, 572 U.S. at 901 (claims are indefinite only if they "fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention"). Here, consulting a POSITA's understanding confirms—rather than creates—certainty about what "the recipient address" means.

Second, the claim language itself provides additional context confirming a POSITA's understanding. Claim 8, which depends from claim 1, expressly recites "examining a recipient address to determine whether the recipient address is a private routing address." '410 patent, claim 8. As above, even where a term lacks express antecedent basis, a claim is not indefinite "[i]f the

scope of a claim would be reasonably ascertainable by those skilled in the art." *Energizer Holdings*, 435 F.3d at 1370–1371. Read together with claim 8 and in the context of the claims as a whole, "the recipient address" in claims 9 and 10 is readily ascertainable. *Phillips*, 415 F.3d at 1313; *CryptoPeak Sols., LLC v. Lowe's Home Ctrs.*, No. 2:15-cv-1737-RWS-RSP, 2016 U.S. Dist. LEXIS 135666, *15–16 (E.D. Tex. Sep. 9, 2016).

Third, the specification provides ample disclosure confirming a POSITA's understanding of "recipient address." The specification discusses recipient addresses in the context of determining routing: "the server of the private domain may examine an internal record to determine whether the recipient is a member of the private domain." '410 patent at 7:43–46. The specification further teaches that the system routes messages accordingly, depending on whether the recipient is a member of the private domain or not. *Id*. at 7:47–61. These disclosures describe to a POSITA in sufficient detail what the patentee meant by "recipient address"—the address used to identify and route electronic information to the intended recipient.

Fourth, Zoho bears the burden of proving indefiniteness by clear and convincing evidence and must show that the claim terms at issue, "when read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus*, 572 U.S. at 901; *see also Sonix*, 844 F.3d at 1377. Indeed, during prosecution the Office identified an antecedent-basis issue with this phrasing, and the applicant resolved it—confirming that the term is amenable to construction and definite. *See Energizer Holdings*, 435 F.3d at 1370–1371. Given that claim 8 expressly introduces "a recipient address," the specification discusses recipient addresses in the routing context, and the concept is inherent in any network transmission to a recipient, the intrinsic record informs a POSITA with reasonable certainty about the scope of "the recipient address." Zoho cannot satisfy

this heavy burden.

The '421 patent claims are to the same effect. Claim 11 introduces "a recipient address," and claims 12 and 13 use that term in the same routing context. '421 patent, claims 11–13. Because the '421 shares a common specification with the '410, the analysis above applies with equal force: a POSITA would ascertain the scope of "the recipient address" with reasonable certainty. *Energizer Holdings*, 435 F.3d at 1370–1371.

**D.   CLAIMS 24, 26, 70, 72 OF THE '421 PATENT**

| Knossos's Position | Zoho's Proposed Construction |
|---|---|
| **No construction necessary. Not indefinite.** | **Indefinite as improperly directed to an apparatus and use of that apparatus. *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377 (Fed. Cir. 2005).** |

Zoho argues these claims are indefinite under *IPXL Holdings* because they allegedly recite both an apparatus and a method of using that apparatus. This mischaracterizes both the claims and the law. Claim 24 recites "[a] machine-readable medium storing instructions thereon which, when executed by a processor, cause the processor to perform a method." '421 patent, claim 24. Claim 26 recites "[a] data processing system, comprising: a processor; a memory coupled to the processor; and a plurality of instructions which, when executed from the memory, cause the processor to" perform specified operations. *Id.*, claim 26. Claim 70 recites "[a] machine-readable medium storing instructions thereon which, when executed by a processor, cause the processor to perform a method comprising...." *Id.*, claim 70. And Claim 72 recites "[a] data processing system" *Id.*, claim 72. Each limitation defines what the *system's instructions cause the processor to do*—not what a user does with the system. This is standard apparatus claiming that does not create the hybrid apparatus-plus-method-of-use problem that *IPXL Holdings* condemns.

In *IPXL Holdings*, the claim at issue recited a system and then added a step requiring "the

user uses the input means to either change the predicted transaction information or accept the displayed transaction." 430 F.3d at 1384. The Federal Circuit held this language indefinite because it was "unclear whether infringement of claim 25 occurs when one creates a system that allows the user to change the predicted transaction information . . . or whether infringement occurs when the user actually uses the input means." *Id.*

That concern is absent here. The challenged claims are directed to a data processing system and define what the system's instructions cause the processor to do when executed. To the extent the claims refer to conditions such as a sender having logged into the server, that language describes the circumstances and network environment in which the claimed system operates—not a separate, affirmative act of use that a third party must perform to complete infringement. The claims therefore do not present the build-versus-use ambiguity that animated *IPXL Holdings*. The Federal Circuit has repeatedly upheld such "data processing system" claims reciting processor-executable instructions, including where the claims also recite functional or conditional language describing how and when the system operates. *See Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367, 1374–1375 (Fed. Cir. 2008) (reversing indefiniteness finding where apparatus claims recited structural limitations and functional language, holding "[d]irect infringement of claim 1 is clearly limited to practicing the claimed method in a pipelined processor possessing the requisite structure"); *HTC Corp. v. IPCom GmbH & Co., KG*, 667 F.3d 1270, 1277–1278 (Fed. Cir. 2012) (reversing indefiniteness ruling and holding that apparatus claims describing the network environment in which the mobile station operates are not hybrid claims under *IPXL Holdings*). Zoho cannot meet its burden.

## V. CONCLUSION

For the foregoing reasons, Knossos respectfully requests that the Court find that no construction is necessary for the disputed terms and reject Zoho's indefiniteness challenges.

---

**PLAINTIFF KNOSSOS GLOBAL SYSTEMS LLC'S OPENING CLAIM CONSTRUCTION BRIEF**

Dated: <u>June 25, 2026</u>

Respectfully submitted,

By: <u>/s/ C. Matthew Rozier</u>

James F. McDonough, III (GA 117088) *
**ROZIER HARDT MCDONOUGH, PLLC**
659 Auburn Avenue NE, Unit 254
Atlanta, Georgia 30312
Telephone (404) 564-1866
Email: jim@rhmtrial.com

Jonathan L. Hardt (TX 24039906) *
**ROZIER HARDT MCDONOUGH PLLC**
712 W. 14th Street, Suite A
Austin, Texas 78701
Telephone: (210) 289-7541
Email: hardt@rhmtrial.com

C. Matthew Rozier (CO 46854) *
**ROZIER HARDT MCDONOUGH PLLC**
1001 Bannock Street, Suite 241
Denver, Colorado 80204
Telephone: (404) 779-5305; (202) 316-1591
Email: matt@rhmtrial.com

*Attorneys for* **Plaintiff KNOSSOS GLOBAL SYSTEMS LLC**

\* admitted to the Eastern District of Texas

**Exhibits**

    A.   U.S. Patent No. 8,819,410

    B.   U.S. Patent No. 8,266,421

    C.   June 24, 2013 Office Action

    D.   October 14, 2013 Amendment and Response

    E.   October 8, 2013 Examiner Interview Summary

## CERTIFICATE OF SERVICE

I hereby certify that on this day I caused a true and correct copy of the foregoing document to be filed electronically in compliance with Local Rule CV-5(a).  As such, this document was served on all counsel who are deemed to have consented to electronic service.

Dated:  June 25, 2026

By: */s/ C. Matthew Rozier*

Matthew Rozier