## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

KNOSSOS GLOBAL SYSTEMS LLC,

      Plaintiff,

    v.

ZOHO CORPORATION PRIVATE
LIMITED,

      Defendant.

Civil Action No. 2:25-cv-00414-JRG-RSP

## <u>DEFENDANT ZOHO CORPORATION PRIVATE LIMITED'S<br>RESPONSIVE CLAIM CONSTRUCTION BRIEF</u>

**TABLE OF CONTENTS**

I.      INTRODUCTION ...........................................................................................................1

II.     LEGAL STANDARD.....................................................................................................2

III.    BACKGROUND .............................................................................................................4

IV.     ARGUMENT...................................................................................................................5

       A.     "Private Domain" Means "a Domain That Is Not Routable via a Public Network" (All Asserted Claims)................................................................................5

            1.     The Parties Have a Genuine Scope Dispute the Court Must Resolve .........5

            2.     The Specification Compels Zoho's Construction .......................................6

            3.     Knossos's Claim-Differentiation Argument Fails on Its Own Premise.......9

            4.     Zoho's Construction Does Not Require a "Hermetically Sealed" Network.....................................................................................................10

            5.     The Prosecution History Refutes Knossos's Reading ...............................11

            6.     The Extrinsic Evidence Supports Zoho's Construction............................12

       B.     "Private Routing Address" Is Indefinite for Lack of Antecedent Basis ('410 Claims 5, 6) ..............................................................................................14

       C.     "The Recipient Address" Is Indefinite for Lack of Antecedent Basis ('410 Claim 10; '421 Claims 12–13)...............................................................................16

       D.     Claims 24, 26, 70, and 72 of the '421 Patent Are Indefinite Hybrid Claims Under *IPXL* ................................................................................................20

            1.     The Challenged Claims Recite Acts of the Sender and the Recipient, Not Capabilities of the Apparatus...............................................................21

            2.     *Microprocessor Enhancement* and *HTC* Do Not Save These Claims .......22

V.      CONCLUSION...............................................................................................................22

## TABLE OF AUTHORITIES

**Cases**

*Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*,262F.3d1258 (Fed.Cir.2001) ..... 2, 8

*Bicon, Inc. v. Straumann Co.*, 441 F.3d 945(Fed. Cir. 2006) ........................................................ 9

*Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371(Fed. Cir. 2004) ................................... 16, 19

*CryptoPeak Sols., LLC v. Lowe's Home Ctrs.*, No. 2:15-cv-1737-RWS-RSP, 2016 U.S. Dist. LEXIS 135666, 2016 WL 7198705 (E.D. Tex. Sept. 9, 2016)........................................... 19, 20

*Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366(Fed. Cir. 2006)....... 3, 15, 16, 19

*ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509(Fed. Cir. 2012) .............................................. 3

*GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304(Fed. Cir. 2014) ..................................... 9

*HTC Corp. v. IPCom GmbH*, 667 F.3d 1270 (Fed. Cir. 2012)...................................................... 22

*H-W Tech., L.C. v. Overstock.com, Inc.*, 758 F.3d 1329 (Fed. Cir. 2014)................................. 3, 20

*In re Katz Interactive Call Processing Pat. Litig.*, 639 F.3d 1303(Fed. Cir. 2011) ....................... 3

*IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377(Fed. Cir. 2005).......................... 3, 20

*Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295(Fed. Cir. 2004) .................... 2, 7, 8

*Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898(Fed. Cir. 2004).......................................... 9

*Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364(Fed. Cir. 2005) .................................... 9

*Microprocessor Enhancement Corp. v. Texas Instruments Inc.,* 520 F.3d 1367 (Fed. Cir. 2008)22

*Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91(2011) ................................................................. 3

*Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898(2014). ....................................... 3, 17, 21

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521F.3d1351(Fed.Cir.2008) ............... 1, 3, 6

*Phillips v. AWH Corp.*, 415 F.3d 1303(Fed. Cir. 2005) (en banc) .......................................... 2, 12

*Rembrandt Data Techs., LP v. AOL, LLC*, 641 F.3d 1331(Fed. Cir. 2011) ................. 3, 16, 19, 20

*Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362(Fed. Cir. 2012)............................... 11

**Statutes**

35 U.S.C. § 112...................................................................................................................... 15, 18

## I.      INTRODUCTION

Knossos's "plain and ordinary meaning" positions should be seen for what they are:  a vehicle for recapturing what its patents expressly disclaimed—standard email with encrypted content.  The background section of the patents' shared specification expressly disclaims standard encrypted email content as inadequate prior art, '410 patent at 1:37–50, yet Knossos's brief (and infringement contentions) reveal it interprets the asserted patents and the notion of a "private domain" to cover standard email with encrypted email content.  *See* Knossos's Opening Brief (Dkt. No. 41, "Knossos Br.") at 4 (identifying "encryption of *content* using transmission-specific symmetric keys").  Indeed, Knossos tells the Court that "private domain" is "easily understood" and needs no construction and then devotes nine pages to arguing that the term means a "domain with members, associated servers, and encrypted transmissions," and is "fundamentally a membership-based community."  Knossos Br. at 4–5; *see generally id.* at 4–13.  That is not a plain-meaning position but a proposed construction, advanced under a label that spares Knossos the burden of defending it.  The parties have a concrete dispute about claim scope: whether a "private domain" must be private in the way the shared specification consistently describes it—a domain whose addresses cannot be routed via the public network— or whether it is any community with a membership list.  That dispute is for the Court, and labeling the term "plain" does not resolve it.  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361–62 (Fed. Cir. 2008).

The specification resolves the dispute.  From the Summary of the Invention forward, it equates the private domain with addresses that the public Internet cannot recognize or route: "Electronic information in this private domain will not route outside of the private domain," and its addresses—whatever their format—"in any case . . . remain unroutable outside the private domain."  '410 patent at 3:10–23.  The disclosure repeats the same meaning at every stage:  in

1

the description of the problem, the addressing scheme, the private top-level domain, and the

encryption alternative.  Membership is the mechanism that controls who may *use* the private

domain; non-routability via the public network is what makes the domain *private*.  Knossos's

reading erases the core feature of the term and its alleged invention.

The remaining three disputes are problems of the patentee's own drafting.  Dependent

claims of both patents-in-suit recite "the private routing address" and "the recipient address,"

definite articles with no antecedent basis anywhere in the claims from which they depend.[1]  And

four apparatus claims of the '421 Patent recite acts that only a human sender or recipient can

perform, rendering them invalid under the framework of *IPXL Holdings* and its progeny.

## II.    LEGAL STANDARD

Claim terms take the ordinary and customary meaning they would have to a person of

ordinary skill in the art at the time of the invention, read in light of the intrinsic record, and the

specification is "the single best guide to the meaning of a disputed term."  *Phillips v. AWH

Corp.*, 415 F.3d 1303, 1312–17 (Fed. Cir. 2005) (en banc). Knossos's recitation of the law of

claim construction omits two principles that matter here.  First, lexicography does not require a

glossary: "the specification may define claim terms 'by implication' such that the meaning may

be 'found in or ascertained by a reading of the patent documents.'"  *Bell Atl. Network Servs., Inc.

v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1271 (Fed. Cir. 2001); *accord Irdeto Access, Inc.

v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004) (construing term according to

the specification's consistent usage).  Second, where the parties genuinely dispute the scope of a

---

[1] Knossos observes that Zoho "offers no POSITA testimony in support of its indefiniteness positions"; none is required.  Knossos Br. at 1.  The antecedent-basis defects appear on the face of the claims and in the prosecution history, and indefiniteness is a question of law.  *ePlus*, 700 F.3d at 517.

term, the Court must resolve the dispute: "When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute." *O2 Micro*, 521 F.3d at 1362. A ruling of "plain and ordinary meaning" is inadequate where, as here, reliance on plain meaning does not resolve the parties' actual disagreement. *Id.* at 1361.

A claim is indefinite if, "read in light of the specification delineating the patent, and the prosecution history, [it] fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). Indefiniteness must be shown by clear and convincing evidence, *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011), but it is "a question of law and in effect part of claim construction," *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012). Antecedent basis may be supplied by implication—but only where the referent is reasonably ascertainable. *Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1370–71 (Fed. Cir. 2006). Courts "may not redraft claims, whether to make them operable or to sustain their validity." *Rembrandt Data Techs., LP v. AOL, LLC*, 641 F.3d 1331, 1339 (Fed. Cir. 2011) (citation omitted).

Finally, "reciting both an apparatus and a method of using that apparatus renders a claim indefinite under section 112, paragraph 2," because the public cannot know whether infringement occurs when the apparatus is made or when a person uses it. *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005). The rule applies to system claims, *In re Katz Interactive Call Processing Pat. Litig.*, 639 F.3d 1303, 1318 (Fed. Cir. 2011), to apparatus claims reciting method steps, *Rembrandt*, 641 F.3d at 1339–40, and to computer-readable-medium claims, *H-W Tech., L.C. v. Overstock.com, Inc.*, 758 F.3d 1329, 1335–36 (Fed. Cir. 2014).

3

III.    **BACKGROUND**

The Asserted Patents describe a system for exchanging electronic mail privately over public networks.  As the specification recounts, conventional email was "the equivalent of postcards readable by anyone watching them go by."  '410 patent at 1:33–34.  The prior art's solution was encryption, but standard email encryption protected only the message body.  As the patents explain, encryption could make message *content* unreadable, but "[n]one of these solutions make anything other than the content private," and "making email content private does not prevent spam, viruses, or malware."  *Id.* at 1:40–62.  That is, the patents set out to protect the *addresses themselves*.

The patents propose to solve that problem by making the addresses themselves private. The patents accomplish this by creating a "private network community" where members exchange messages using private domain addresses that the public Internet "does not recognize and is unable to route" absent "the techniques of the embodiments of the present invention."  *Id.* at 4:30–34, 5:10–21.  The specification describes two ways to create such an address: (1) give it a private top-level domain ("PTLD") outside the registered domains that public DNS recognizes, so that the routing equipment of the open Internet "will not recognize the [PTLD], denying its access for movement on the open Internet," *id.* at 9:62–10:18, or (2) encrypt the address itself, so that "almost everything in a message is private, not just the contents," *id.* at 4:40–44.  Either way, the result is the same: the disclosed techniques "take at least a portion of the publicly accessible network private," *id.* at 4:65–5:5, creating a domain whose addresses "are readable and routable only by" the private domain's own servers, *id.* at 15:8–18.  *See id.* at 9:62–10:32; Declaration of Jon Weissman, Ph.D., in Support of Zoho Corporation's Claim Construction Positions ("Weissman Decl.") ¶¶ 52–63 (walking through these disclosures); *id.* ¶¶ 25–50 (describing the DNS resolution-and-routing architecture on which they rest).

4

Membership and subscription control who may send and receive within the domain; they are how the domain is *used*, not what makes it *private*.  Knossos's description of the specification inverts this architecture, presenting membership as the invention and relegating the stated problem—the public routability of addresses—to an optional afterthought.

## IV.    ARGUMENT

### A.    "Private Domain" Means "a Domain That Is Not Routable via a Public Network" (All Asserted Claims)

| Knossos's Position | Zoho's Proposed Construction |
|---|---|
| No construction necessary. | "a domain that is not routable via a public network" |

#### 1.    The Parties Have a Genuine Scope Dispute the Court Must Resolve

While Knossos argues "no construction necessary," its arguments advance a very particular meaning for a "private domain."  As the opening brief makes clear, Knossos is using a purported "plain and ordinary meaning" to extend the patent to any encrypted email service with member accounts, contending that a private domain is any "domain with members, associated servers, and encrypted transmissions."  Knossos Br. at 5.

But as any user of email knows, even conventional email services require a user to sign up and to have a member account to use the service.  And the specification describes standard email encryption as inadequate prior art.  *See* '410 patent at 1:40–62 (encryption solutions left addresses publicly routable on the open Internet; "[n]one of these solutions make anything other than the content private").

Knossos argues at length that the "private domain" is "fundamentally a membership-based community served by dedicated infrastructure—not merely a routing characteristic," Knossos Br. at 5, and it deploys that gloss to resist construction of this phrase.  The parties thus

5

dispute whether the claims require that the domain's addresses be non-routable via the public network, a question pertaining to both infringement and validity. The Court should resolve that dispute. Instructing the jury that the term carries its "plain meaning" would simply hand the jury the parties' competing arguments. *O2 Micro*, 521 F.3d at 1361–62. Indeed, Knossos never explains how a "plain meaning" construction would resolve the scope question its own nine pages of argument put in play.

### 2.    The Specification Compels Zoho's Construction

The Summary of the Invention introduces the claimed method and system as one "using private domain addresses to route information over a private domain within electronic networks such as the Internet," and explains the property that makes the domain private: "Electronic information in this private domain will not route outside of the private domain." '410 patent at 3:10–12. The specification goes on to describe everything else about how the private domain is implemented—inbound routing of outside information, encryption, whether public addresses are routable inside the domain—as specific to particular embodiments. *Id.* at 3:12–23. But the specification is clear that the private domain is different. After noting that private domain addresses "may have . . . the formats of current Internet addresses," the specification reaffirms that "[h]owever, *in any case*, they may be made public and still remain unroutable outside the private domain." *Id.* (emphasis added). "In any case" is the language of definition, not a specific implementation. Whatever the embodiment, whatever the address format, and whatever traffic crosses into the domain, the private domain's own addresses do not route on the public network. *See* Weissman Decl. ¶¶ 52–53.

Knossos contends that this statement describes a mere "architectural effect" of the claimed system, rather than the meaning of the term. Knossos Br. at 6, 10. But this misses the mark; a property the patentee stated categorically, reaffirmed "in any case," and held constant

across every disclosed variation is not the incidental effect of particular implementations.  It is what the patentee said the private domain is.  In any event, the label does not matter.  Whether one calls non-routability a definition or the invariant architecture of the invention, the specification consistently attributes non-routability to the private domain, and a term used in one consistent sense throughout the specification takes that meaning.  *Bell Atlantic*, 262 F.3d at 1271; *Irdeto*, 383 F.3d at 1300; *see also* Weissman Decl. ¶¶ 54–55.

And the specification uses the term the same way.  The private domain's addresses "are not standard email addresses used in the publicly accessible network, such as the Internet. The Internet does not recognize and is unable to route them." '410 patent at 5:10–21; Weissman Decl. ¶ 54.  Client computers "may use an Internet unroutable address as a sender address and/or a recipient address," so that even a spammer who obtains the address "cannot send a spam message to the client using the client's email address, which is unroutable in the Internet." *Id.* at 6:49–56.  In the "two-portion" address embodiment, a first portion is "compatible with a standard email address that is publicly routable in the Internet," while the second portion is "privately recognizable," enabling routing only within the private network—so the address "as a whole cannot be routed through the Internet." *Id.* at 6:57–64; Weissman Decl. ¶ 55.  The private top-level domain "is not routable over the open Internet, as industry standard TLDs are registered and controlled by an industry governing body, and the PTLD is not a part of the registered set," so public routing equipment and domain name servers will not recognize it, "denying its access for movement on the open Internet." *Id.* at 10:8–18; Weissman Decl. ¶¶ 56–57.  The specification generalizes this point beyond email: "the above techniques may be applied to all Internet addresses (e.g. Uniform Resource Identifiers [URIs]) that are not email addresses, such as, for example, Web addresses." *Id.* at 10:30–32; Weissman Decl. ¶ 56.  The "private

7

community" functions as a closed routing domain: its members' "addresses are readable and routable only by" the hosting server, and "[o]ther servers will not understand the private addresses." *Id.* at 15:8–18; Weissman Decl. ¶ 58. And in the encryption alternative, "the addresses and other information are encrypted such that almost everything in a message is private, not just the contents"—the address is kept off the public network not by its format but by its unreadability. *Id.* at 4:40–44; Weissman Decl. ¶¶ 61–62. As Dr. Weissman also describes it, these passages are unequivocal to a POSITA, who would have been familiar with the DNS resolution-and-routing architecture the disclosed private domain relies upon. Weissman Decl. ¶¶ 25–50, 70.

This consistent usage throughout the specification shows the intent of the inventors. The specification need not say "private domain means"; it is enough that it uses the term in one sense "throughout the entire patent specification," such that the meaning is "found in or ascertained by a reading of the patent documents." *Bell Atl.*, 262 F.3d at 1268, 1271; *Irdeto*, 383 F.3d at 1300. Nor is this importing a limitation from a preferred embodiment. Zoho's construction deliberately takes no position on *how* non-routability is achieved, recognizing that the specification discloses several ways to do so, such as PTLD, two-portion address, or encryption. Weissman Decl. ¶ 71. Instead, Zoho's construction requires one property the specification attributes to every embodiment without qualification.

The shared specification does not merely describe prior-art encrypted email; it disparages it: encryption made message content unreadable, but "[n]one of these solutions make anything other than the content private," leaving addresses exposed on the open Internet. '410 patent at 1:40–62. A specification "rife with remarks that disparage" a prior-art approach disclaims it, *Openwave Sys., Inc. v. Apple Inc.*, 808 F.3d 509, 513–14 (Fed. Cir. 2015). As in *Openwave*,

"it is difficult to envisage how, in light of the repeated disparagement" of content-only encryption, one could read "private domain" to cover conventional email services that encrypt content while their addresses remain routable on the public network. *Id.* at 517. Yet that is exactly where Knossos's "membership-based community" reading leads.

### 3.    Knossos's Claim-Differentiation Argument Fails on Its Own Premise

Knossos's lead argument is that dependent claims 6 and 7 recite non-routable *address* structures, so reading non-routability into "private domain" would render them superfluous. Knossos Br. at 5–8. The argument fails on Knossos's own premise. Knossos insists— correctly—that a domain is not an address. *Id.* at 6, 10–12. But Zoho's construction states a property of the *domain:* it is not routable via a public network. Claims 6 and 7 recite *specific address mechanisms*: a two-portion address whose parts have defined compatibility properties (claim 6), and an address including a Private Top Level Domain (claim 7). Under Zoho's construction those claims retain independent scope, because a domain can satisfy claim 1 through means other than claim 6's structure or claim 7's PTLD, for example, the encryption embodiment in which addresses are encrypted rather than structurally non-standard. *See* Weissman Decl. ¶¶ 61–63; '410 patent at 7:15–26. That is, the dependent claims are species, and the construction states the genus. There is no redundancy.

Even so, the presumption of claim differentiation is, in any event, rebuttable, and it yields to the specification, as Knossos's own authorities recognize. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906-7 (Fed. Cir. 2004); *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014). Claim differentiation also cuts against Knossos's own reading. Claim 1 of the '410 patent *separately* recites "determining . . . whether the recipient is a member of the private domain by examining a record of members of the private domain"; '410 patent claim 15 and '421 patent claim 20 add further membership steps. If "private domain"

9

itself *meant* "membership-based community," those express membership limitations would do no work. *See Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."); *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) (claims are interpreted "with an eye toward giving effect to all terms in the claim"). Knossos cannot wield claim differentiation against Zoho's construction while advancing a reading that violates the doctrine far more directly.

### 4. Zoho's Construction Does Not Require a "Hermetically Sealed" Network

Knossos argues that Zoho's proposed construction is wrong because the private domain "interoperates with the public Internet," citing the non-member notification email, '410 patent at 7:53–61, "treaties" between private domains, *id.* at 15:8–18, and claim 1's transmission "over an electronic network" that may be the Internet, *id.* at 5:38–57, claims 2–3. *See* Knossos Br. at 8–9, 11–12. This, however, attacks a construction Zoho has not proposed. "Not routable via a public network" is a property of the private domain's *own addresses*: they cannot serve as routable destinations on the public network. It does not forbid the system from touching public infrastructure. Indeed, in each embodiment Knossos cites, the private addresses never traverse the public network as routable destinations. The notification to a non-member is "a standard email addressed to the standard email address of the recipient," a separate, public address; the private address goes nowhere. *See id.* at 7:53–61. Similarly, inter-community "treaty" traffic works because "server farms match private addresses on the private network with their underlying public addresses," i.e., the servers translate between public and private addresses at the border of the private domain, with only public addresses crossing it. *Id.* at 10:24–32. And claim 1's transmission over the Internet is the carrier packet: it is addressed to the *publicly*

10

*routable* address of the private-domain server, while the private address rides encrypted inside the payload, invisible to public DNS and routing, as Dr. Weissman explains.  Weissman Decl. ¶¶ 59–62.

The specification's statement that "some public addresses may be routable in the private domain," '410 patent at 3:21–23, is likewise no help to Knossos: it is expressly embodiment-specific, and it concerns traffic in the opposite direction—public addresses reaching *into* the private domain. The asymmetry is familiar to any POSITA: a host behind a network address translator can initiate connections outward while remaining unaddressable from the public Internet.  Weissman Decl. ¶ 53.  These embodiments confirm the construction; they do not contradict it.

### 5.    The Prosecution History Refutes Knossos's Reading

Knossos argues that, because the applicant overcame a rejection based on Langford[2] with membership-based amendments, membership, not routability, must define "private domain." Knossos Br. at 9–10.  The inference does not follow, and the record affirmatively undercuts it. The applicant never defined "private domain" and never equated it with a membership community.  Instead, it added a separate membership-*determination* step to claim 1. Overcoming prior art by adding a limitation says nothing about the meaning of a different term that was in the claim all along, and it is not the "clear and unmistakable" disavowal required to alter a term's meaning.  *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1366–67 (Fed. Cir. 2012).

Worse for Knossos, the exchange it relies on contradicts its construction.  The examiner mapped "private domain" to Langford's "secured group."  Knossos Br., Ex. C (Dkt. 41-3) at

---

[2] U.S. Patent No. 6,266,420 to Langford.

KNOS-ZOHO001025 (reading claim 1's "transmissions between members of the private domain" onto Langford as "initiating communications between a secured group").  Langford's secured group *is* a membership-based community: recipient lists identify "each member of a particular group," an administrative entity "maintains the membership of the group," and group security credentials are distributed to members.  Ex. 1, U.S. Patent No. 6,266,420 at 1:54-67; 2:36-60; 5:3-8; *see also id.* at Abstract.  If "private domain" simply meant "membership-based community," then Langford disclosed one.  But the applicant told the examiner that "Langford is completely silent as to *communicating over a private domain*, determining that a recipient is a member of a private domain, and providing the recipient's public key . . . .," identifying "communicating over a private domain" as a separate deficiency from the membership determination.  Knossos Br., Ex. D (Dkt. 41-4) at KNOS-ZOHO001064–65 (emphasis added).  Thus, the applicants treated "private domain" as something more or different than a membership group.  At minimum, the prosecution history is neutral on the term's meaning, which returns the analysis to the specification, and the specification, as shown, is unambiguous.  *Phillips*, 415 F.3d at 1315–17.

### 6.    The Extrinsic Evidence Supports Zoho's Construction

The only evidence of how a POSITA would understand this phrase comes in the form of Dr. Weissman's testimony.  While Knossos spends several pages arguing about the evidence cited by Dr. Weissman, the extrinsic evidence is congruent with and supports Zoho's proposed construction.

Knossos observes that RFC 1918 concerns IP addresses rather than domain names.  Knossos Br. at 11.  Dr. Weissman says so himself; the point is that RFC 1918 is the contemporaneous, canonical usage of "private" at the network-addressing layer, and it means exactly what Zoho's construction says: "routing information about private networks shall not be

propagated on inter-enterprise links, and packets with private source or destination addresses should not be forwarded across such links." RFC 1918 § 3 (Weissman Decl. Ex. F); Weissman Decl. ¶¶ 44–47, 67. RFC 1918 even contemplates the precise architecture Knossos calls a contradiction: two sites "communicate with each other over a public network" by encapsulating traffic at their borders, "thus keeping their private addresses private." RFC 1918 § 5. Crossing the public network is permitted; appearing on it as a routable address is not. This is essentially the same as the encryption embodiment described in the specification. '410 patent at 7:15–26.

Similarly, the April 2004 Wikipedia DNS entry distinguishes a "private name system" from "domain names implemented in the public Internet DNS system," the same public/private line that Zoho's construction draws. Weissman Decl. ¶¶ 48, 69. And Knossos's argument that the carrier-packet explanation "undermines" the construction is a non sequitur: that the private address is "doubly insulated"—never used to address the carrier packet, and unreadable inside it—is precisely why the private domain is not routable via the public network even though carrier packets cross public infrastructure. Knossos Br. at 11–12; *see* Weissman Decl. ¶ 62. Knossos's observation that "the private domain exists regardless of whether the carrier packet crosses public infrastructure" restates Zoho's construction; it does not refute it.

Nor is Zoho's use of "public network" in the construction a reason to resist it. The specification uses "open Internet," "publicly accessible network," and "the Internet" interchangeably for the same public DNS-and-routing infrastructure described by Dr. Weissman, e.g., '410 patent at 1:40–62, 4:65–5:5, 5:10–21, 9:62–10:32. Zoho's inclusion of "public network" carries that meaning. And the link from non-resolution to non-routability is the specification's own logic, not Dr. Weissman's gloss. *See* Knossos Br. at 8–9. Because public

13

DNS will not recognize a PTLD, the address is denied "access for movement on the open Internet." *Id.* at 10:8–18.

Knossos also criticizes Dr. Weissman's clarification that a particular implementation is not required by Zoho's construction. Knossos argues that this clarification "proves too much" because claim 1 recites a membership step. Knossos Br. at 12. This misreads the claims and Dr. Weissman's testimony. Paragraph 71 of Dr. Weissman's declaration says only that no *particular implementation*—PTLD, encryption, a particular kind of server farm, or membership in a particular subscriber community—is itself the *meaning* of "private domain." That is entirely consistent with claim 1 separately reciting a membership-determination limitation, just as it separately recites servers and encryption. Indeed, that consistency is the point of section A.3 above: the membership step is an express claim limitation precisely because it is not inherent in the term "private domain."

Thus, the Court should construe "private domain" as "a domain that is not routable via a public network." The Court should also reject Knossos's "membership-based community" gloss on its pseudo-"ordinary meaning," which imports an unclaimed limitation, renders the claims' express membership steps redundant, and would read "private domain" onto the prior art the applicant distinguished.

### B.    "Private Routing Address" Is Indefinite for Lack of Antecedent Basis ('410 Claims 5, 6)

| Knossos's Position | Zoho's Proposed Construction |
|---|---|
| No construction necessary. Not indefinite. | Indefinite. |

Claim 5 of the '410 patent recites: "The method of claim 1, wherein the format of *the private routing address* contains one or more characters that are discretionarily selectable by an administrator of the private domain." (emphasis added). Claim 1, from which claim 5 depends,

14

never recites a private routing address.  The first time the term appears in the claim chain, it arrives with a definite article referring to nothing.  Claim 6, which depends from claim 5, inherits the defect and compounds it: after reciting portions of "the private routing address," it concludes that "*the private routable address* as a whole is not routable within the public domain of the network," a third coined term, likewise introduced nowhere.  (Claim 7 repeats "the private routing address" as well.)

Knossos fails to address the core argument, contending that claim 6's detailed structure shows a POSITA would understand what a private routing address *is*.  Knossos Br. at 13–14.  That is an answer to the wrong question.  The problem is not that "private routing address" is an unknowable concept; it is that claims 5 and 6 refer to "*the*" private routing address of claim 1's method, and claim 1 contains none.  Which address of claim 1's method must have an administrator-selectable format?  The sender's?  The recipient's?  An address the method never recites?  The claim does not say, and the specification cannot answer a question about a referent the claim never introduces.

Knossos offers three sources of antecedent basis—antecedent basis by implication with claim 19, clarity from the Abstract, and inherency in claim 1.  Knossos Br. at 14–15.  None works.  Claim 19 does recite "a private routing address," but claim 19, like claim 5, depends directly from claim 1.  Parallel dependent claims do not lend limitations to one another.  35 U.S.C. § 112, ¶ 4.  If anything, claim 19 shows the drafter knew how to introduce the term with an indefinite article and did not do so in claim 5.  Next, the Abstract is not a claim; a definite article in a claim cannot take its antecedent from outside the claims.  And Knossos points to no authority suggesting that the recitation of a term in the Abstract somehow supplies antecedent basis for that term in arbitrary claims.  Finally, inherency fails for the reason shown above: claim

15

1 does not require a private routing address.  Claims 8 and 9 confirm that claim 1's method encompasses transmissions in which the recipient's address is publicly routable—no private routing address ever appears.  A limitation that need not exist in the claimed method cannot be its own antecedent.

*Energizer* is distinguishable: the implied antecedent there was recited earlier in the same claim, and the referent was reasonably ascertainable.  435 F.3d at 1370–71.  In *Energizer*, the Federal Circuit found that the recited "anode gel" was, by implication, the antecedent basis for the phrase "said zinc anode" in the following claim language: "**an anode gel comprised of zinc as the active anode component**, wherein the cell contains less than 50 parts of mercury per million parts by weight of the cell and **said zinc anode** has a gel expansion of . . ."  *Id.* at 1369 (emphasis added).  Here the term is absent from the claim it modifies and from every claim in its dependency chain, and there is no comparable phrase from which a person of skill in the art could determine the referent of "the private routing address."  Nor may the Court supply the missing antecedent by rewriting claim 5.  *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) (courts construe a claim "as written, not as the patentees wish they had written it"); *Rembrandt*, 641 F.3d at 1339–40.  In light of the intrinsic record, there is no question that claims 5 and 6 of the '410 patent are invalid.

**C.**     **"The Recipient Address" Is Indefinite for Lack of Antecedent Basis ('410 Claim 10; '421 Claims 12–13)**

| Knossos's Position | Zoho's Proposed Construction |
|---|---|
| No construction necessary. Not indefinite. | Indefinite. |

Claim 1 of the '410 patent recites "a recipient"—a person—and never recites any "recipient address."  Claim 10, which depends from claim 1, nonetheless recites:

16

> The method of claim 1, further comprising transmitting the electronic information to the server over the network connection if *the recipient address* is a private routing address, wherein the electronic information is retrievable by the recipient subsequently from the server with the private routing address of the recipient.

'410 patent, claim 10 (emphasis added). The '421 patent has the same defect: claim 1 recites only "a recipient," but claim 12 (depending from claim 1) recites "if *the recipient address* is not a private routing address" and directs transmission "using *the publicly routable recipient address* and sender address," and claim 13 (also depending from claim 1) recites "if *the recipient address* is a private routing address." '421 patent, claims 12–13 (emphasis added). Neither definite-article term has any antecedent in the claims from which these claims depend.[3]

The missing antecedent is not a formality here, because the claims themselves make "recipient address" a variable with at least two possible values. '410 patent claims 8 and 9 and '421 patent claims 11 and 12 establish that a recipient address may be "a private routing address" or a "publicly routable recipient address." The entire function of claims 10, 12, and 13 is conditional: the recited step applies only "if the recipient address" is (or is not) a private routing address. A POSITA cannot apply the condition without knowing *which* address the claim tests. The claim thus fails to inform, with reasonable certainty, the scope of the invention. *Nautilus*, 572 U.S. at 901.

Indeed, the applicants conceded this exact defect during prosecution. During prosecution of the '410 patent, the examiner rejected claims under § 112, ¶ 2 on precisely this ground:

> Claim 8 recites the limitation "the recipient address" and "the publicly routable recipient address" and "the sender address" in the claim. There is insufficient antecedent basis for this limitation in the claim.

---

[3] Knossos's heading includes '410 patent claim 9 and '421 patent claim 11, but those claims recite "*a* recipient address"—the indefinite article—and are not the subject of Zoho's indefiniteness arguments.

Knossos Br., Ex. C (Dkt. 41-3) (June 24, 2013 Final Office Action) at KNOS-ZOHO001023–24. The applicant did not dispute the rejection. Instead, it "amended the claim to correct the lack of antecedence noted by the Examiner," changing each definite article to an indefinite one— "wherein if [the] *a* recipient address is not a private routing address . . . using [the] *a* publicly routable recipient address and a sender address." Knossos Br., Ex. D (Dkt. 41-4 ) (Oct. 14, 2013 Amendment) at KNOS-ZOHO001056-57, 001063. That amended claim issued as '410 patent claim 9, and it now reads "a recipient address." But the identical phrase in the sibling application claim, which issued as '410 claim 10, was never amended. Issued claim 10 still reads "the recipient address," carrying the exact defect the examiner identified and the applicant conceded in claim 9.

This history highlights the deficiencies in Knossos's argument. Knossos argues that "during prosecution the Office identified an antecedent-basis issue with this phrasing, and the applicant resolved it—confirming that the term is amenable to construction and definite." Knossos Br. at 16. But the applicant "resolved" the issue by deleting the defective article, a concession that the definite-article phrasing lacks antecedent basis, not a demonstration that it is definite. This cure never reached claim 10 (or the '421 patent claims). An examiner's failure to catch the same defect in a sibling claim is an oversight; definiteness of the issued claim is for this Court under *Nautilus*, and the patentee's own prosecution conduct is powerful evidence of what the phrasing lacks.

Knossos also points to '410 patent claim 8 and '421 patent claim 11, which recite "a recipient address." Knossos Br. at 15–17. But claims 10, 12, and 13 do not depend from those claims; all depend directly from claim 1. A dependent claim incorporates the limitations of "the

18

claim to which it refers," 35 U.S.C. § 112, ¶ 4, not the limitations of its siblings. A term introduced in one dependent claim is not present in a parallel dependent claim.

Knossos again argues that a recipient address is "inherent" in claim 1's transmission of information to a recipient over a network. Knossos Br. at 15–16. Whatever force that intuition has in general, the claims here defeat it: the patents treat "recipient address" as a term with alternative species—private or publicly routable—and the challenged claims are conditional on which species is present, similar to the issues with "private routing address" discussed above. Notably, claim 1 does not require any private routing address at all; claim 9 confirms the method covers recipients with only publicly routable addresses.

Again, *Energizer* does not save the claim. As discussed above, the term "said zinc anode" found its antecedent by implication in "an anode gel comprised of zinc as the active anode component" recited earlier in the same claim. 435 F.3d at 1370–71. Here, nothing in claim 1 or in the challenged claims introduces any recipient address, and the claim family supplies two competing candidates. *Energizer*'s implication doctrine does not stretch to inserting a limitation the claim omitted. The Court cannot redraft claims to find them valid. *Rembrandt*, 641 F.3d at 1339–40; *Chef Am.*, 358 F.3d at 1374 (the claim is construed "as written, not as the patentees wish they had written it").

Knossos's only other authority, *CryptoPeak Sols., LLC v. Lowe's Home Ctrs.*, No. 2:15-cv-1737-RWS-RSP, 2016 U.S. Dist. LEXIS 135666, 2016 WL 7198705 (E.D. Tex. Sept. 9, 2016), contains no antecedent-basis analysis at all. It is a report and recommendation on Rule 12(b)(6) motions raising *IPXL* hybrid-claiming, § 101, and terms-of-degree indefiniteness challenges; it nowhere addresses whether one dependent claim can supply antecedent basis for a

19

term in a parallel dependent claim.  It does not support the proposition for which Knossos cites it.

The defect is on the face of the claims and is confirmed by the patentee's own concession.  The clear-and-convincing standard is met.  '410 patent claim 10 and '421 patent claims 12–13 are indefinite.

**D.**     **Claims 24, 26, 70, and 72 of the '421 Patent Are Indefinite Hybrid Claims Under *IPXL***

| Knossos's Position | Zoho's Proposed Construction |
|---|---|
| No construction necessary. Not indefinite. | Indefinite as improperly directed to an apparatus and use of that apparatus. |

A claim that recites "both an apparatus and a method of using that apparatus" is indefinite, because a competitor cannot know "whether infringement . . . occurs when one creates a system that allows the user" to perform the step, "or whether infringement occurs when the user actually uses" it.  *IPXL*, 430 F.3d at 1384.  The Federal Circuit has applied the rule wherever claim language ties infringement to a person's act rather than the apparatus's capability: to system claims reciting that "callers digitally enter data," *Katz*, 639 F.3d at 1318 (language "directed to user actions, not system capabilities"); to an apparatus claim ending with the method step "transmitting the trellis encoded frames," *Rembrandt*, 641 F.3d at 1339–40; and to a "tangible computer readable medium" claim whose limitations recited "wherein said user completes" a transaction and "wherein said user selects" an offer, *H-W Tech.*, 758 F.3d at 1335–36.  This Court has framed the inquiry the same way: the question is whether the claim recites "a step that must be taken by the user or by the user's system," as opposed to "merely a capability or characteristic of the system."  *CryptoPeak*, 2016 WL 7198705, at *5.

20

**1.    The Challenged Claims Recite Acts of the Sender and the Recipient, Not Capabilities of the Apparatus**

Claims 24 (machine-readable medium) and 26 (data processing system) recite instructions that cause the processor to perform, among other operations, "accepting a subscription to services of a private domain *by a sender*" and "logging into the server using an identifier uniquely identifying a sender of the electronic information before transmitting the electronic information."  '421 patent, claims 24, 26 (emphasis added).  Subscribing to a service and logging in with one's identifier are acts of the *sender*—a human user—not operations a processor performs by executing stored instructions.  The operations list is incoherent in a second way: it mixes acts of incompatible actors.  "Accepting a subscription . . . by a sender" and "limiting the number of electronic information transmissions that the sender is able to send" are acts of the service; "transmitting the security package to the server" is an act of a client; subscribing and logging in are acts of a person.  No single processor executing one set of stored instructions can be the actor for all of them, so the "capabilities of the system" reading Knossos needs is not merely wrong but impossible on the claims' own terms, and a POSITA is left without reasonable certainty as to whose conduct the claims cover, or when.  *Nautilus*, 572 U.S. at 901.

Claims 70 and 72 recite the recipient-side counterpart: "transmit[ting] a request to a server over a network for receiving electronic information" and "receiv[ing] the electronic information from the server in response to the request," with wherein clauses requiring that the electronic information was received by the server only after "the sender of the electronic information has logged into the server."  *Id.*, claims 70, 72. Nor is the log-in clause the only such condition: the claims also require that the requested information have been "sent by a sender having a subscription to services," welding a second user's completed conduct—subscribe,

21

connect, log in, send—into a recipient-side apparatus claim. *Id.* Infringement of each claim is therefore ambiguous in exactly *IPXL*'s way: does one infringe by making or selling the medium or system with these instructions, or only when a sender actually subscribes and logs in—or a recipient actually requests and retrieves? The claims do not say. That is the build-versus-use ambiguity that *IPXL*, *Katz*, *Rembrandt*, and *H-W Tech.* condemn.

### 2. *Microprocessor Enhancement* and *HTC* Do Not Save These Claims

Knossos quotes each claim's preamble and stops, Knossos Br. at 17–18, characterizing the log-in language as "the circumstances and network environment in which the claimed system operates." Its authorities do not reach these claims. In *Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, the functional language described what the claimed pipelined processor itself does, and infringement was "clearly limited to practicing the claimed method in a pipelined processor possessing the requisite structure." 520 F.3d 1367, 1374–75 (Fed. Cir. 2008). In *HTC Corp. v. IPCom GmbH*, the claims recited network functions as "the underlying network environment in which the mobile station operates"; the apparatus was defined by its environment, not by a third party's conduct. 667 F.3d 1270, 1277–78 (Fed. Cir. 2012). Neither case blesses claims in which the recited operations are a separate person's acts: a sender's subscription, a sender's log-in, a recipient's request. "Accepting a subscription . . . by a sender" is not an environment. The Court should hold claims 24, 26, 70, and 72 indefinite.

## V. CONCLUSION

For the reasons above, Zoho respectfully requests that the Court construe "private domain" as "a domain that is not routable via a public network"; find '410 patent claims 5–6 ("the private routing address") and '410 patent claim 10 and '421 patent claims 12–13 ("the recipient address") invalid as indefinite for lack of antecedent basis; and find '421 patent claims 24, 26, 70, and 72 invalid as indefinite under *IPXL Holdings*.

22

Respectfully submitted,

Date: July 9, 2026

*/s/ Phillip J. Haack*

Ryan J. Marton (*Admitted E.D. Tex.*)
ryan@martonribera.com
Phillip J. Haack (*Admitted E.D. Tex.*)
phaack@martonribera.com
MARTON RIBERA SCHUMANN & CHANG LLP
548 Market Street, Suite 36117
San Francisco, CA 94104
415-360-2514

*Attorneys for Defendant Zoho Corporation Private Limited*

23

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that on July 9, 2026, I electronically filed this document with the Clerk of the Court for the Eastern District of Texas using the ECF System, which will send notification to the registered participants of the ECF System as listed on the Court's Notice of Electronic Filing.  The undersigned further certifies that versions filed under seal are being served by electronic mail.

*/s/ Phillip J. Haack*
Phillip J. Haack
