**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

KNOSSOS GLOBAL SYSTEMS LLC,

        Plaintiff,

  v.

ZOHO CORPORATION PRIVATE
LIMITED,

        Defendant.

Civil Action No. 2:25-cv-00414-JRG-RSP

**DECLARATION OF JON WEISSMAN, PH.D., IN SUPPORT OF ZOHO**
**CORPORATION'S CLAIM CONSTRUCTION POSITIONS**

I, Jon Weissman, declare as follows:

1.     I submit this Declaration in support of the claim construction positions of

Defendant Zoho Corporation Private Limited ("Zoho") in the above-captioned matter.  I provide

background information regarding the technology of the asserted patents and my opinions

regarding how a person of ordinary skill in the art at the time of the alleged invention would have

understood the meaning of the term "private domain."

2.     I make this declaration based upon my own personal knowledge and, if called

upon to testify, would testify competently to the matters contained herein.

**I.     QUALIFICATIONS, EXPERIENCE, AND PUBLICATIONS**

3.     The following is a brief summary of my background and qualifications. My

background and qualifications are more fully set out in my curriculum vitae (CV), attached as

Exhibit A.

1

4.      I am currently a Professor of Computer Science and Engineering at the University of Minnesota, a title I have held since the summer of 2012.  I was an Associate Professor from fall of 2003 to spring of 2012 and an Assistant Professor from 1999 to 2003 (both at the University of Minnesota).  Before that, I was an Assistant Professor in the Department of Computer Science at the University of Texas at San Antonio from 1995 to 1999.

5.      I earned my Ph.D. in 1995 and my Master of Science in 1989, both in Computer Science, at the University of Virginia.  I earned my Bachelor's degree in Applied Mathematics and Computer Science at Carnegie-Mellon University in 1984.

6.      At the University of Minnesota, I am an Investigator with the Center for Research in Intelligent Storage (CRIS), consisting of faculty colleagues and both graduate and undergraduate students.  CRIS is a partnership between universities and industry, and does research in a number of areas, including distributed and networked computer systems and Internet technologies.

7.      I have taught computer science for nearly 25 years.  I have taught numerous undergraduate and advanced graduate classes in Internet/Web technologies, distributed systems, networking, database and data storage systems and operating systems.  I have also advised dozens of Ph.D. and M.S. students whose research has involved Internet protocols, distributed systems, and network services.

8.      I was a member of the technical staff at Mitre Corporation from 1989–1991, and was a software engineer at Software A&E from 1984–1987. I have published over 100 technical articles, most at highly competitive refereed conferences and rigorously reviewed journals.  I have served as a program committee member of many of the most prestigious refereed conferences in my fields of expertise, and have served as program chair, general chair, or

2

steering committee member for several. A list of my publications and professional service is included in my CV at Exhibit A.

## II.   COMPENSATION

9.      I am being compensated for my time spent on this matter at my usual and customary rate of $800/hour. My compensation is not related to the outcome of this action and I have no financial interest in this case.

## III.   MATERIALS CONSIDERED

10.      In preparing this declaration, I have considered U.S. Patent No. 8,266,421 (the "'421 Patent") and U.S. Patent No. 8,819,410 (the "'410 Patent") (collectively, the "Patents-in-Suit"), their respective prosecution histories, and the parties' claim construction disclosures as of the date of this declaration.  I have also considered the extrinsic materials cited in this declaration, including the materials listed in the parties' disclosures of extrinsic evidence.  I have further relied upon my over thirty years of general experience in the field, though the testimony I offer in this declaration is based on the materials I cite, not on undisclosed prior experience.

## IV.   SUMMARY OF OPINIONS

11.      I understand that Knossos Global Systems LLC ("Knossos") has filed the present lawsuit against Zoho Corporation Pvt. Ltd. ("Zoho") and alleges infringement of claims 1–6, 8–11, 14, 16, and 18–20 of the '410 Patent and claims 1–5, 7, 8, 10–15, 18, 24, 26–31, 33–38, 43–45, 48, 50–55, 57, 63–67, 70, and 72 of the '421 Patent.

12.      I understand from my review that the '410 Patent issued from a continuation of the application that issued as the '421 Patent, and that the two Patents-in-Suit share a common written description.  Unless otherwise noted, citations to column and line numbers in this declaration refer to the '410 Patent specification and apply equally to the corresponding disclosure in the '421 Patent.

3

13.     If called as a witness to testify at a claim construction hearing, I expect to testify on the following topics and provide opinions and testimony on what is summarized in this declaration:

- the '410 Patent and '421 Patent, their specification, claims, and the technology underlying what is disclosed in them;

- the level of ordinary skill in the art to which the Patents-in-Suit are directed;

- the technology background relevant to the Patents-in-Suit, including the operation of the Internet, the Domain Name System ("DNS"), and how Internet requests are routed to particular machines through DNS lookups; and

- my opinions on how the disputed term "private domain" would have been understood by a person of ordinary skill in the art at the time of the alleged invention.

## V.    CLAIM CONSTRUCTION PRINCIPLES

14.     I am not an attorney. I have been informed by counsel of certain principles of claim construction that I have applied in forming the opinions set forth in this declaration.

15.     I understand that claim terms are generally given their ordinary and customary meaning, which is the meaning the term would have to a person of ordinary skill in the art at the time of the alleged invention.

16.     A person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the term appears, but also in the context of the entire patent, including the specification.

17.     Intrinsic evidence—the claims, the specification, and the prosecution history—is the most important source of meaning.  The specification is highly relevant to this analysis and is usually dispositive.  It is the single best guide to the meaning of a disputed term.

18.     Extrinsic evidence, such as technical dictionaries, treatises, and industry standards, may be considered to help the court understand the technology and the meaning a term

4

would have had to a person of ordinary skill in the art at the time of the alleged invention, but cannot contradict the intrinsic record.

19.    A patentee may act as its own lexicographer by clearly defining a term in the specification, and may disavow the full scope of a term through clear statements in the specification or prosecution history.

## VI.    LEVEL OF ORDINARY SKILL IN THE ART

20.    I have been informed that one of the relevant factors in this proceeding is the level of ordinary skill in the pertinent art.

21.    Both Patents-in-Suit claim priority to a provisional application filed on April 22, 2004.  I have used April 2004 as the relevant time of the alleged invention for purposes of my analysis.

22.    Having reviewed the Patents-in-Suit, in my opinion, a person of ordinary skill in the art (a "POSITA") as of April 2004 would have had at least a bachelor's degree in computer science, computer engineering, electrical engineering, or a related field, together with two to three years of professional experience designing, implementing, or administering networked computer systems.  That experience would include working familiarity with the Internet protocol suite (TCP/IP), the Domain Name System, electronic mail transport (e.g., SMTP), and basic concepts of network security and encryption.  Additional graduate education could substitute for some portion of the professional experience, and additional professional experience could substitute for some portion of the formal education.

23.    I have applied this definition for purposes of my analysis in this declaration. My opinions would not change if a slightly higher or lower degree of expertise were applied, because I am analyzing terminology that would have been interpreted the same among persons having different skill levels within the range above.

5

24.     I am qualified to offer opinions from the perspective of a POSITA.  I had the qualifications described above, and substantially more, as of April 2004.

## VII.    TECHNOLOGY BACKGROUND

25.     This section describes background concerning the Internet, the Domain Name System, and how Internet traffic is routed to particular machines through DNS lookups. The concepts described in this section were well established and well known to persons of ordinary skill in the art as of April 2004.

### A.    The Internet, IP Addresses, and Routing

26.     The Internet is a global system of interconnected computer networks that communicate using a common set of protocols known as the Internet Protocol Suite, commonly referred to as TCP/IP.  Each device that participates directly in the public Internet is identified by a numeric Internet Protocol (IP) address.  Routers in the network use these IP addresses to forward packets of data toward their destinations.

27.     Numeric IP addresses (such as 192.0.2.25) are convenient for routing equipment but are not convenient for people to remember or type.  The Domain Name System ("DNS") was developed to bridge that gap. As the 2002 edition of the Microsoft Computer Dictionary explains:

> DNS n. … The hierarchical system by which hosts on the Internet have both domain name addresses (such as bluestem.prairienet.org) and IP addresses (such as 192.17.3.4). The domain name address is used by human users and is automatically translated into the numerical IP address, which is used by the packet-routing software.

Ex. B, Microsoft Computer Dictionary 167 (5th ed., Microsoft Press 2002) ("Microsoft Dictionary").  In this example, the domain name, is bluestem.prairienet.org, which would translate to the IP address 192.17.3.4.  In a sense, the relationship between an IP address and DNS is akin to the relationship between a phone number and the phone book.  Because it is

6

inconvenient to remember arbitrary numbers for every computer a person might want to communicate with, a database that associates names with numbers is useful.  As explained in more detail below, the domain name space is a hierarchy, so *bluestem.prairienet.org* is part of the *prairienet.org* domain, which is itself part of the *org* top-level domain (TLD).

### B.    The Domain Name System

28.    DNS was developed in the 1980s to replace a centralized HOSTS.TXT file maintained  by the Network Information Center ("NIC"), originally part of the Stanford Research Institute (SRI).  HOSTS.TXT was a plain text file, each line of which contained an IP address and its corresponding domain name, essentially functioning as a centralized directory for networked systems.  If a user wanted to connect to a computer with a specific domain name, their computer would consult a local copy of HOSTS.TXT to resolve the name into the necessary numerical IP address.  If the domain name was not listed, communication would fail, necessitating the file's completeness and accuracy.  The HOSTS.TXT file was distributed manually; system administrators would connect to the NIC's FTP (File Transfer Protocol) server and periodically download new copies.  This became unworkable as the network grew.

29.    The replacement for the HOSTS.TXT regime is a protocol called the Domain Name System, or DNS.  It is described in a series of "Request for Comments" (RFC).  RFCs are published technical documents that define the protocols, procedures, and conventions used by the Internet.  RFCs are produced and maintained by the Internet Engineering Task Force (IETF), an open, volunteer-driven standards body whose membership is not restricted by company affiliation, nationality, or formal credentials.  The RFC process typically begins when an engineer or working group circulates an "Internet-Draft" proposal describing a proposed protocol or convention.  That draft is reviewed and revised through public discussion on IETF mailing lists and at IETF meetings, and is often refined through experimental implementations.  When

the working group reaches rough consensus that the document is technically sound and ready, the IETF leadership approves it and the RFC Editor publishes it under a permanent, sequentially assigned RFC number.

30.    Once published, an RFC is never altered; later changes are made by issuing a new RFC that updates or obsoletes the earlier one.  RFCs vary in formal status, some are Internet Standards, others are Best Current Practices, Informational, or Experimental. Together they constitute the authoritative written record of how the Internet works.

31.    The copies of the RFCs attached to this declaration were downloaded from the RFC Editor website, https://www.rfc-editor.org/, which is the official repository of current and historical RFCs.  *See* Internet Engineering Task Force, *RFCs*, https://www.ietf.org/process/rfcs/ (last visited May 14, 2026) ("The RFC Editor website is the authoritative site for RFCs.").

32.    The foundational specifications for the Domain Name System, RFC 1034 and RFC 1035, were both published in November 1987 by Paul Mockapetris of the USC Information Sciences Institute.  Ex. C, P. Mockapetris, "Domain Names — Concepts and Facilities," RFC 1034 (Nov. 1987) ("RFC 1034"); Ex. D, P. Mockapetris, "Domain Names — Implementation and Specification," RFC 1035 (Nov. 1987) ("RFC 1035").

33.    These RFCs were the core technical specifications governing the public DNS as of April 2004.  Knowledge of these RFCs and of the DNS architecture they collectively specify was within the ordinary skill in the art.

34.    The Domain Name System is, by design, a single, hierarchical name space. Single, in the sense that there is one DNS: a shared system of names that everyone on the public Internet uses and that resolves the same way for everyone.  When two people in different parts of

the world type in *www.example.com*, their computers ask the same DNS servers[1] and end up at the same destination.  It is hierarchical in the sense that names are organized as an upside-down tree, with the most general part at the top and the most specific part at the bottom. Reading a name from right to left walks you down that tree. For *www.example.com*:

- *com* is one of a small, fixed set of top-level domains one level under the root.  The root sits above *.com*, *.org*, *.gov*, and every other TLD, and is administered as a single registry.

- *example* is a second-level name registered inside *.com* and is handed out by the *.com* registry.

- *www* is a host (i.e. a computer) or subdomain that the owner of *example.com* decided to create within their own slice of the tree.

35.      The original DNS RFCs deliberately rejected a flat, decentralized, or peer-to-peer naming scheme in favor of this tree structure for practical reasons.  A single tree means everyone agrees on what a name refers to; a hierarchy means responsibility for keeping things accurate can be delegated downward rather than concentrated at one place; and the structure is scalable. Adding a new name doesn't require updating a central master list as in the HOSTS.TXT system it replaced; the new name is just added to someone's own portion of the tree.  *See* Ex. C, RFC 1034 §§ 2.2, 3.1 ("The primary goal is a consistent name space which will be used for referring to resources. … The domain name space is a tree structure.")

36.      Domain names are written from most-specific to least-specific, with labels separated by dots.  The rightmost label is the top-level domain ("TLD") (e.g., .com, .org, .net, .edu, .gov, or country-code TLDs like .fr or .sg).  To the left of the TLD is the second-level

---

[1] It is typical for DNS servers to cache responses, so a local DNS server could potentially service a request without tracing down the DNS hierarchy from the root to the hostname in the request. But the same servers are still authoritative for a given domain name, and those servers will be contacted in the absence of a cached response.

domain (e.g., "wikipedia" in wikipedia.org), and additional subdomains may appear further to the left.  While the terms "domain" and "domain name" are often used interchangeably, in a more technical sense, the "domain name" typically refers to a specific name within the DNS tree (for example, the full name *www.example.com* that resolves to a particular machine), whereas a "domain" refers to a portion of the tree (such as *example.com* or *.com* itself) that may contain many domain names beneath it.  As the Microsoft Dictionary explains:

> domain name n. An address of a network connection that identifies the owner of that address in a hierarchical format: server.organization.type. For example, www.whitehouse.gov identifies the Web server at the White House, which is part of the U.S. government.

Ex. B, Microsoft Dictionary at 168; *see also id.* at 168 ("domain").  So, in the domain name *www.txed.uscourts.gov*, the domain name "www.txed.uscourts.gov" identifies the web server (called "www") for the Court's website.  This is also called a "resource record" in the RFCs.  These are part of the "domain name space," such that the record that associates www.txed.uscourts.gov to the IP address "199.107.17.29" is part of the *.gov* top-level domain, the *uscourts.gov* subdomain of that top-level domain, and the *txed.uscourts.gov* subdomain of the second-level domain.  *See* Ex. C, RFC 1034 § 2.4.

**C.   The Public Top-Level Domains Are a Controlled, Registered Set**

37.   The set of TLDs that exist in the public Internet DNS is not open-ended.  It is a controlled set, administered by central authorities and reflected in the root zone.  The DNS root zone is the master file used by the Internet's root name servers to delegate authority for each top-level domain (.com, .org, .fr, .gov, and the rest).  Membership in the root zone is what makes a TLD part of the public DNS; a name whose rightmost label is a TLD not present in the root zone cannot be resolved by ordinary public DNS resolvers, because the root servers have no referral to give for it.

38.    As of April 2004, the Internet Corporation for Assigned Names and Numbers ("ICANN") was the body responsible for coordinating the management of the root zone, and thus responsible for which TLDs are present in the public Internet.  The Microsoft Dictionary entry quoted above reflects this point: domain names use a fixed set of TLDs reflecting either the type of entity (.com, .edu) or the geography (.fr, .sg).  Ex. B, Microsoft Dictionary at 168.

39.    A contemporaneous secondary source, the April 2004 Wikipedia entry on the Domain Name System, summarizes the same architecture and the policy role of ICANN:

> The Internet DNS system… is based on thirteen "root servers" worldwide, whose IP addresses are distributed independently of the DNS using a "root hints" file. From these root servers, the rest of the Internet DNS name space is delegated to other DNS servers which serve names within specific parts of the DNS name space. … ICANN (Internet Corporation For Assigned Names and Numbers) is the international body that oversees the domain name industry….

Ex. H, Wikipedia, the Free Encyclopedia, *Domain Name System*, http://en.wikipedia.org/wiki/Domain_name_system (April 11, 2004) [https://web.archive.org/web/20040411051510/http://en.wikipedia.org/wiki/Domain_name_system] ("Wikipedia DNS Entry").

**D.    How a DNS Lookup Routes a Request to a Particular Machine**

40.    Each level of the DNS "delegates" authority to the level below it.  The root zone delegates *.com* to one registry; that registry delegates *example.com* to the owner of *example.com*; that owner decides what (if anything) lives at *www.example.com*.  When a computer looks up a name, it walks the tree from the root downward, asking each level which server is responsible for the next level down, until it reaches the server that knows the actual answer.  This delegation allows for the DNS to be distributed.  Each portion of the name space is delegated to authoritative name servers, and the servers refer queries to one another along the hierarchy.  A leading practitioner reference work on DNS, *DNS and BIND*, describes the architecture in similar terms, explaining that DNS is "a distributed database" in which "[t]he programs that store

information about the domain name space are called name servers," and "resolvers" are "the clients that access name servers" on behalf of applications. Ex. I, Paul Albitz & Cricket Liu, DNS and BIND ch. 2 (4th ed. 2001) ("Albitz & Liu").

41.     A DNS lookup is the mechanism by which a domain name like www.txed.uscourts.gov is converted into the IP address of a particular machine, so that Internet routing software can deliver packets to that machine. When an application on a host (for example, a Web browser or an email client) needs to contact a remote machine by domain name, it asks the local DNS resolver to look up the domain name.  The resolver, in turn, consults the DNS hierarchy: it begins by asking one of the root name servers (whose addresses come from the resolver's built-in or configured "root hints"), follows referrals down through the TLD name server for the relevant TLD (e.g., *.gov*), then to the authoritative name server for the second-level domain (e.g., *uscourts.gov*), and potentially a third-level (e.g. *txed.uscourts.gov*) and ultimately receives a resource record (an "A" record) containing the IP address that corresponds to the requested name.  Ex. C, RFC 1034 §§ 4–5 (describing name servers and the resolution algorithm); Ex. D, RFC 1035 §§ 3–7 (formats and protocol); Ex. I, Albitz & Liu chs. 2–3.

42.     A critical implication of this architecture is that DNS resolution can succeed only when the requested domain lies within the public name space delegated from the root zone.  If the rightmost label of the requested name is not a TLD that has been delegated in the root zone, the lookup necessarily fails: the root servers will not refer the resolver to any TLD server (because none exists), and so the resolver cannot obtain an IP address for the domain.  For example, a lookup for "www.txed.uscourts.gov.xyz123" will fail because there is no ".xyz123" TLD.  Without an IP address, the routing software in the public Internet has nothing to which it

12

can send packets.  As Albitz & Liu explain, the public Internet name space is rooted in a single, central root that delegates only to the established TLDs. Ex. I, Albitz & Liu ch. 2.

### E.      Private IP Address Space and Private Name Space

43.      The Internet engineering community has long recognized a distinction between IP addresses and domains that are part of the public Internet (and therefore reachable through the public routing and name-resolution infrastructure) and those that are not.

44.      With respect to IP addresses, RFC 1918 (February 1996), "Address Allocation for Private Internets," formalized this distinction at the IP-address level.  Ex. F, Y. Rekhter et al., "Address Allocation for Private Internets," RFC 1918 (Feb. 1996) ("RFC 1918").  RFC 1918 designates specific blocks of IP addresses for use within an enterprise as "private" addresses. The defining property of those IP addresses is not that the machine using one is unreachable from the public Internet by every conceivable means; it is that the *private address itself* is not propagated into the public Internet's routing system.  RFC 1918 § 3 makes the rule explicit: "routing information about private networks shall not be propagated on inter-enterprise links, and packets with private source or destination addresses should not be forwarded across such links."  Ex. F, RFC 1918 § 3.  That is, certain blocks of IP addresses are assumed to be private and therefore not intended to be routed-to via the conventional routing mechanisms.

45.      The same RFC contemplates that computers using private IP addresses may nevertheless communicate with the public Internet through mediating gateways, such as network address translators or application-layer gateways, that substitute a publicly routable address for the private one before traffic crosses the public network.  *Id*. §§ 2, 3. The private IP address itself, in other words, never appears as a routable destination on the public Internet, even when traffic from a privately-addressed host reaches a public destination through a gateway.  The RFC explains:

13

> We will refer to the hosts in the first and second categories as "private."
> We will refer to the hosts in the third category as "public." … If a private
> network needs external connectivity, then there are two basic ways for
> that network to obtain that connectivity: it can either use "non-private"
> (i.e., globally unique) addresses for the hosts that need connectivity, or it
> can use a method to translate the private addresses to public addresses
> (e.g., via a network address translator).

Ex. F, RFC 1918 §§ 2–3. RFC 2050 (Nov. 1996), "Internet Registry IP Allocation Guidelines,"

Ex. G, similarly addresses how globally unique addresses are allocated through the Internet

Registry system, reinforcing the public/private distinction at the addressing (IP) layer.

46.     RFC 1918 also shows that the Internet engineering community uses the term

"private" in the network-addressing context to refer specifically to addresses that are kept off the

public Internet's routing system, those addresses for which "routing information … shall not be

propagated on inter-enterprise links" and which "should not be forwarded across such links."

Ex. F, RFC 1918 § 3. While RFC 1918 contemplates that computers using private IP addresses

may communicate with the public Internet through mediating gateways, the gateway substitutes

a publicly routable address for the private one; the private address itself never appears as a

routable destination on the public Internet. *Id*. §§ 2, 3.

47.     This standard IP-based usage of private versus public network identifiers is a

parallel usage to the usage that the Patents-in-Suit adopt when they refer to "private" domains,

addresses, and networks: the *private address* is not routable via the public network, even though

the systems implementing the private domain may interact with the public network through other

(publicly routable) addresses.

48.     A directly analogous distinction exists at the naming layer, that is, in the names

that the public DNS resolves. The April 2004 Wikipedia entry on DNS expressly distinguishes

private DNS namespaces from the public Internet DNS:

14

> Any IP computer network can use DNS to implement its own private name system. However, the term "domain name" is most commonly used to refer to domain names implemented in the public Internet DNS system. This is based on thirteen "root servers" worldwide….

Ex. H, Wikipedia DNS Entry.  In other words, while it is technically possible to run a private DNS infrastructure that resolves names which do not appear in the public root zone (for example, by using a non-standard, unregistered TLD), names of that type are by their nature not resolvable, and therefore not routable, through the generic Internet routing and DNS software available on the public Internet.

49.     A POSITA in April 2004 would have understood that a domain name using a TLD that is not part of the public root zone's delegated set cannot be resolved by ordinary Internet DNS resolvers, and that, as a consequence, ordinary Internet routing software has no way to deliver traffic to a host identified by such a name.  This is the technical backdrop against which the Patents-in-Suit describe their "private domain."

50.     Encryption provides another well-understood means by which addresses can be kept off the public Internet.  When an address is carried inside an encrypted payload, the public Internet's DNS resolvers and routing equipment cannot read the address and therefore cannot resolve or deliver traffic to it.  As of April 2004, a person of ordinary skill in the art would have understood that an address rendered unreadable to public DNS and routing software, whether by using a name outside the public root zone's delegated set, by encrypting the address itself and thus rendering it unreadable, or by some combination of the two, is, for that reason, not routable on the public network.

## VIII.   THE TERM "PRIVATE DOMAIN"

51.     I understand that the parties have proposed competing constructions for the term "private domain," which appears in the asserted claims of both Patents-in-Suit.  I understand that

Zoho proposes to construe "private domain" to mean "a domain that is not routable via a public network." In my opinion, that construction is consistent with how a POSITA in April 2004 would have understood the term in light of the intrinsic and extrinsic evidence.

### A.    The Specification Repeatedly Equates "Private Domain" with a Domain Whose Addresses Are Not Routable on the Public Internet

52.    The shared specification of the Patents-in-Suit makes clear, in passage after passage, that the defining characteristic of the "private domain" is that its addresses are not routable through the public Internet (i.e., through the public Internet DNS and packet-routing infrastructure described in Section VII above). The opening summary of the invention introduces the concept in precisely those terms:

> [A] method and system is provided using private domain addresses to route information over a private domain within electronic networks such as the Internet. Electronic information in this private domain will not route outside of the private domain. In one embodiment, electronic information outside the private domain will not route inside the private domain. The private domain addresses may have, but not be limited to, the formats of current Internet addresses. However, in any case, they may be made public and still remain unroutable outside the private domain. In another embodiment, a variety of encryption techniques are used to encode private routing information within the private domain. In a further embodiment, some public addresses may be routable in the private domain.

'410 Patent at 3:10–23.

53.    Two features of this passage warrant attention. First, the defining characteristic of the "private domain" appears as an unconditional statement: "Electronic information in this private domain will not route outside of the private domain." That sentence is not qualified by "in one embodiment" or a similar phrase; it states a property of the private domain as such. Second, the passage describes which information moves between the private domain and the outside world as a matter of embodiment, not definition. The patentee identifies one embodiment in which outside information will not route into the private domain, and a further

16

embodiment in which "some public addresses may be routable in the private domain." Those embodiment-specific statements do not contradict Zoho's proposed construction. They confirm that the construction operates on the private domain's own addresses, i.e., that those addresses are not routable via a public network, while leaving open whether a particular embodiment also permits routing in the other direction (for example, allowing a user inside the private domain to reach a public address, or excluding such cross-traffic entirely). This asymmetry is common. For example, a host behind a network address translator (part of most common home Internet routers) can initiate a connection to a public address while not being addressable from the public Internet. The same asymmetry appears in the described embodiments.

54.     The specification repeats the same point throughout. The "private domain (e.g., private network) addresses are used to define users in a private domain, also referred to as a private network community." '410 Patent at 4:30–34. The encryption and other techniques used in embodiments of the invention "take at least a portion of the publicly accessible network private." *Id*. at 4:65–5:5. "[T]he email addresses are not standard email addresses used in the publicly accessible network, such as the Internet. The Internet does not recognize and is unable to route them without the techniques of the embodiments of the present invention." *Id*. at 5:10–21.

55.     Other passages tie the same idea to the Internet routing infrastructure described above:

> According to one embodiment, an email client running at the client computers … may use an Internet unroutable address as a sender address and/or a recipient address to exchange email messages with each other. As a result, even if a spammer obtains an email address of a client, the spammer cannot send a spam message to the client using the client's email address, which is unroutable in the Internet without the techniques of the embodiments of the invention.

'410 Patent at 6:49–56.

17

> In one embodiment, the address includes a first portion and a second portion. The first portion may be compatible with a standard email address that is publicly routable in the Internet, while the second portion is privately recognizable that enables routing within a private network or private network community. Therefore, the address as a whole cannot be routed through the Internet without using the techniques of the embodiments of the invention.

'410 Patent at 6:57–64.

56.     The most direct equation of "private" with non-routability through the public Internet appears in the specification's discussion of private top-level domains.  Figure 4B of the Patents-in-Suit illustrates a "private email address" that includes a "private top level domain" ("PTLD"), such as "loq."  '410 Patent at 9:62–10:3.  The specification then explains why such an address is private:

> In one embodiment, private email address 450 is not routable over the open Internet, **as industry standard TLDs are registered and controlled by an industry governing body, and the PTLD is not a part of the registered set**. Consequently, the routing equipment and software of the open Internet (e.g., domain name servers) will not recognize the PLTD, denying its access for movement on the open Internet. According to one embodiment, software such as an email client add-in … and a server farm … may be required to route the PTLD. In one embodiment, this is accomplished by domain name server methods within the server farms. Much like traditional domain name servers, the server farms match private addresses on the private network with their underlying public addresses (e.g., IP addresses). … It will be appreciated that the above techniques may be applied to all Internet addresses (e.g. Uniform Resource Identifiers [URIs]) that are not email addresses, such as, for example, Web addresses.

'410 Patent at 10:8–32 (emphasis added).

57.     Here, the specification expressly defines what makes the address (and, by extension, the domain) "private": it is "not routable over the open Internet," because the public DNS infrastructure ("domain name servers") does not recognize the relevant TLD, which is "not a part of the registered set" controlled by the industry governing body.  The specification's explanation tracks precisely the architecture I describe in Section VII above: the public DNS

18

resolves only names that are delegated from the root zone, and an address whose TLD is not in that delegated set cannot be resolved by ordinary Internet DNS software, and therefore cannot be routed by the ordinary public Internet routing software that depends on that resolution. Notably, the specification confirms that this principle is not limited to email addresses, but applies to "private domain" addresses generally; the same techniques "may be applied to all Internet addresses (e.g. Uniform Resource Identifiers [URIs]) … such as, for example, Web addresses." *Id*.

58.     The specification reinforces the same point when it describes how the "private community" functions as a closed routing domain hosted by particular servers, separate from the public Internet:

> Senders and recipients may be bound together by a server …. Their addresses are readable and routable only by this server. Other servers will not understand the private addresses (e.g., address 450 of FIG. 4) created for use by this server. Therefore, a "private community" is created by the system for senders and receivers.

'410 Patent at 15:8–18.

59.     The specification describes two additional embodiments in which traffic associated with the private domain crosses the public Internet. Neither is in tension with the construction. First, when a sender within the private domain attempts to deliver a message to a recipient who is not yet a member of the private domain, the server "sends a notification message to the email address of the recipient (e.g., a standard email addressed to the standard email address of the recipient) to notify the recipient that an email message is waiting in the private domain to be downloaded." '410 Patent at 7:53–61. The notification itself uses an ordinary, publicly routable email address (the recipient's standard email address) and travels across the public Internet using ordinary Internet routing and DNS. It has nothing to do with whether the private domain's own addresses are routable via the public network as the notification is made

19

using a public address.  It merely uses a separate, public address to deliver an out-of-band message—a message *about* a message in the private domain, sent over a separate channel (regular email).

60.    Second, the specification contemplates that two private communities may communicate with one another by mutual arrangement: "Server farms may have tables that allow two-way communication with other private communities (e.g., peer-to-peer communities) if both communities concur.  Thus 'treaties' will be encouraged between server farms…."  '410 Patent at 15:8–18.  Here, private addresses within each community remain unroutable via the public network; what crosses between communities, when concurring server farms agree to it, are messages whose private addresses are translated by the participating server farms, consistent with the specification's description that "server farms match private addresses on the private network with their underlying public addresses (e.g., IP addresses)."  *Id*. at 10:8–32.  In both embodiments, the defining property of the private domain holds; its addresses are not routable via the public network.

61.    The specification also describes encryption as a separate mechanism by which a private address is kept off the public network.  In this embodiment, "the addresses and other information are encrypted such that almost everything in a message is private, not just the contents," producing the result, in the specification's words, of "creat[ing] a private domain among users within the electronic network, similar to how a gated community creates privacy in a physical world."  '410 Patent at 4:40–44.  The specification elaborates that "[e]ncryption makes the messages nearly impossible to 'sniff', a kind of network wire-tapping," with the result that "the above techniques take at least a portion of the publicly accessible network private."  *Id*. at 4:65–5:5.

62.     This embodiment, too, is congruent with Zoho's proposed construction.  The specification describes the sender as encrypting the recipient's private address (and other portions of the message) and then transmitting the encrypted message to a server of the private domain "using a communication protocol associated with the network, such as, for example, TCP/IP protocol."  '410 Patent at 7:15–26.  The carrier packet—the TCP/IP packet that traverses the public Internet—is itself addressed to the *publicly routable* address of the private-domain server, not to the private address of the recipient.  Public Internet DNS resolvers and routers act on the server's public address; they never see, and never route to, the recipient's private address.  And, because the recipient's private address is encrypted inside the payload, public-Internet DNS and routing software have no plain-text private address on which to act even if the payload were inspected.  The private address is, in this embodiment, doubly insulated from the public network routing infrastructure: it is not used to address the carrier packet, and it is unreadable to anything that intercepts the carrier packet.  As with the PTLD mechanism, the result is a private address that the public network cannot route, a private domain.

63.     The specification's use of "private domain" is therefore tightly bound, throughout, to the same idea: a domain whose addresses cannot be routed through the public Internet using the public DNS and routing infrastructure.  The specification describes two distinct mechanisms by which addresses are made non-routable in this way: using a private top-level domain that is not part of the public root zone (e.g., the "loq" PTLD shown in Figure 4B) or encrypting the address so that public Internet DNS and routing software have no readable address on which to act.  Both mechanisms produce the same result.  That is precisely what Zoho's proposed construction—"a domain that is not routable via a public network"—captures.

B.    **Extrinsic Evidence Confirms the Same Meaning**

64.    Extrinsic evidence including the contemporaneous DNS RFCs, a popular DNS book for practitioners, the Microsoft Computer Dictionary, and the contemporaneous Wikipedia entry, confirms that a POSITA in April 2004 would have understood "private" in this networking context to mean precisely "not routable via a public network."

65.    First, the DNS RFCs make clear that the public Internet DNS resolves only those domain names that are delegated from a single, hierarchical root zone administered by a central authority. Ex. C, RFC 1034 §§ 2.2, 2.4, 3.1; Ex. D, RFC 1035; Ex. E, RFC 1123.  The chain from name to delivered packet on the public Internet runs through that resolution: an application invokes a DNS resolver to translate a name into an IP address; the resolver queries the public DNS hierarchy starting from the root; only when the resolver receives back an IP address can ordinary public-Internet routing software forward packets to the corresponding host.  A domain name whose rightmost label is a TLD outside the delegated set cannot be resolved by ordinary public DNS resolvers, because no root server will refer the resolver to a TLD server for it. Albitz & Liu's *DNS and BIND* similarly describes the public Internet DNS as a single hierarchical name space rooted in the public root, with delegation flowing downward to the TLD operators.  Ex. E, Albitz & Liu chs. 2–3.  The public DNS is a controlled, delegated system; it does not resolve arbitrary names outside that delegated tree.

66.    Without a resolved IP address, ordinary public-Internet routing software has no destination to which it can send packets.  The specification's description of why a PTLD is not routable over the open Internet, e.g., '410 Patent at 10:8–32, is a direct restatement of this technical fact.  What makes a domain "private" in the sense the specification uses is that the *public* DNS and routing infrastructure cannot reach it, which is what Zoho's proposed construction captures.

22

67.     Second, as discussed in Section VII above, RFC 1918 uses the term 'private' in the network-addressing context to refer specifically to addresses that are intentionally not routable on the public network.  Ex. E, RFC 1918 §§ 2–3.  While RFC 1918 addresses IP addresses rather than domain names, the term "private" carries the same core meaning when applied to a "domain" (i.e., no addresses that are valid within the private domain only can be routed on the public Internet). RFC 2050 likewise reinforces that the public IP address space is itself a controlled, registered set.  Ex. G, RFC 2050.

68.     Third, the Microsoft Computer Dictionary's definitions describe the public DNS as "the hierarchical system by which hosts on the Internet have both domain name addresses … and IP addresses," and define a "domain" in the Internet context as a TLD drawn from the controlled set (".com for commercial users or .edu for educational institutions"). Ex. B, Microsoft Dictionary at 167–68. A POSITA reading those definitions in 2004 would have understood that a domain that is not part of that public, controlled set is one that the public Internet does not recognize and cannot route to.

69.     Fourth, and perhaps most directly, the April 2004 Wikipedia entry on DNS expressly distinguishes private DNS name systems from the public Internet DNS:

> Any IP computer network can use DNS to implement its own private name system. However, the term "domain name" is most commonly used to refer to domain names implemented in the public Internet DNS system. This is based on thirteen "root servers" worldwide….

Ex. H, Wikipedia DNS Entry.  This is essentially the same distinction the specification draws when it contrasts the "private domain" (whose names are not routable on the open Internet) with the "publicly accessible network" (whose names are).

23

## C.  The Proper Construction of "Private Domain"

70. For the reasons above, in my opinion a person of ordinary skill in the art in April 2004, reading the asserted claims in light of the shared specification, would have understood the term "private domain" to mean a domain that is not routable via a public network. That meaning is supported by the specification's repeated equation of "private domain" with addresses unroutable on the open Internet (most directly at '410 Patent 3:10–23; 4:30–34; 4:65–5:5; 5:10–21; 6:49–56; 6:57–64; 9:62–10:32; and 15:8–18), and is confirmed by the contemporaneous extrinsic evidence describing the public DNS as a controlled, registered name space and the term "private" in this context as referring to that which is not reachable through that public infrastructure.

71. I note for clarity that I am not opining that "private domain" requires a particular implementation described in the specification, for example, the use of a non-standard private top-level domain, the use of encryption of addresses or message contents, hosting by a particular kind of server farm, or membership in a particular subscriber community.  The specification describes the PTLD mechanism and the encryption mechanism as alternative ways to make addresses non-routable on the public Internet, but neither mechanism is itself the meaning of the term.  Rather, the defining feature of a "private domain" is that its names and addresses are not routable through the public network.  This is the meaning that consistently appears throughout the specification and is reflected in how a POSITA would have used the term.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration was executed on May 14, 2026, in St. Paul, Minnesota.

_Jon B. Weissman_

_____

Jon Weissman, Ph.D.

24